(No. 64228.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. HENRY BRISBON, Appellant.

*Opinion filed May 24, 1989.—Rehearing denied September 29, 1989.*

202

CALVO, J., took no part.

Miriam F. Miquelon, of Keck, Mahin & Cate, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Shawn W. Denney, Solicitor General, and Terence M. Madsen, Assistant Attorney General, of Chicago, of counsel), for the People.

JUSTICE RYAN delivered the opinion of the court:

This is the second appeal of a death penalty sentence. A jury in Will County found the defendant, Henry Brisbon, guilty of the murder of his fellow inmate, Richard "Hippie" Morgan, at Stateville penitentiary. Following

this verdict, in a separate sentencing hearing, the jury found there were no mitigating factors sufficient to preclude a death sentence and the defendant was sentenced to death pursuant to our death penalty statute (Ill. Rev. Stat. 1983, ch. 38, par. 9—1 *et seq.*). The defendant appealed both the conviction and the death sentence. Upon review, this court affirmed the murder conviction and vacated the death sentence because of errors at the sentencing hearing, and remanded the case for a new sentencing hearing. (*People v. Brisbon* (1985), 106 Ill. 2d 342.) The specific facts pertaining to the defendant's murder conviction and death sentence are set forth in that opinion in detail. Therefore, only the facts necessary for understanding and adjudicating the issues in the present appeal will be repeated.

After the conclusion of the new hearing, the jury again found there were no mitigating factors sufficient to preclude the imposition of the death sentence, and the court sentenced the defendant to death. The defendant appeals this sentence, presenting several arguments that he claims are grounds for vacation of his death sentence. We do not find these arguments persuasive and uphold the defendant's sentence. We will address each of the defendant's arguments separately.

The defendant contends that his death sentence is based upon considerations that are constitutionally impermissible and, thus, require reversal of his conviction. The defendant first argues that the prosecutor's closing arguments constituted reversible error. Specifically, the defendant objects to the following language:

"MR. BURMILA: *** I cannot stress that enough. The defendant in this case, before he killed 'Hippy' Morgan, raped, beat people, burned them, stabbed them, shot them, threatened them with death, and he killed again.

Think about the evidence that has been presented in this case, ladies and gentlemen. Every possible punish-

ment short of death that the law in this State allows has been applied to this Defendant.

He has been placed on probation; it didn't stop him. He received a short prison term; it didn't stop him. He received a long prison term; it didn't stop him. He received concurrent prison terms; it didn't stop him. He got consecutive prison terms; it didn't stop him. And then he got one of the longest, if not the longest, sentences ever in the State of Illinois' history. He got a thousand to three thousand years in the Department of Correction, and within eleven months he killed again.

What other punishment is there that we can give this man but the death penalty? I am not here to coax you, sway you, force you. I am asking you to follow the law. Every punishment that is possible has been applied to this man, and it has not slowed him down one bit.

MR. BJEKICH: Judge, I object. This is not a proper argument. It is not even stating the law properly.

THE COURT: Objection is overruled.

MR. BURMILA: Thank you, Judge. This man has no potential to be rehabilitated. You heard about his prison record. You heard about since he has been convicted in this case, and there is no doubt about his conviction in this case, that the Defendant has continued to act out, threatened other individuals, threatened correctional officers, attacked the Warden. All of those things, all of those things, keep in mind, happening when he still had a date with the twelve of you. All of those things happening knowing that he had a date in this courtroom—

MR. BJEKICH: Objection. That is not proper, and that is not a proper statement.

THE COURT: Objection is sustained."

The defendant, relying on *People v. Holman* (1984), 103 Ill. 2d 133, 177, contends that the prosecutor's remarks, especially the comment that no punishment had served to "slow down" the defendant, were in error because they triggered jury speculation about crimes the defendant might commit in the future and appealed to the jury's passions and fears. The prosecutor in *Holman*

had commented several times about the deterrence rationale of the death penalty. (See *Holman*, 103 Ill. 2d at 161-62.) Several of the prosecutor's statements, however, impermissibly referred to the defendant. For example, the prosecutor commented that

"[w]e will not afford him an opportunity to escape from prison. We will not afford him the opportunity to kill the prison guards. \* \* \*
\* \* \*

What we have, in effect, done by not imposing capital punishment in the proper case is to slaughter, ensure that other innocent people will be killed.
\* \* \*

[If capital punishment is not imposed] the sanctity of life of a convicted killer means more than the sanctity of life of an innocent future victim.
\* \* \*

You will come down on the side of a convicted killer, a convicted murderer, and say, no, he should not be put to death, even though this is the proper case, thereby, virtually, guaranteeing down the road future innocent victims will be slaughtered." *Holman*, 103 Ill. 2d at 162.

In *Holman*, this court held that these remarks constituted unsupported predictions of the types of crimes the defendant would commit if he did not receive the death penalty. (*Holman*, 103 Ill. 2d at 165.) We also found that the prosecutor's remarks "had no function other than to appeal to the passions and fears of the jury and increase the likelihood that the sentence it would recommend would be based on emotion rather than reason." *Holman*, 103 Ill. 2d at 165.

The prosecutor's remarks in the instant case are not fraught with the blatant emotional appeal and unsupported predictions that characterized the prosecutor's remarks in *Holman*. Unlike the prosecutor in *Holman*, the prosecutor in the present case did not make any predictions, nor did he speculate on the nature of future

crimes that the defendant might commit if the jury should not impose the death sentence. Rather, the prosecutor detailed the defendant's criminal history and prior imprisonment, pointing out that during his period of incarceration, Brisbon had killed and had been involved in violent incidents.

The nature and context of the prosecutor's argument becomes much clearer when it is examined in light of his comments made immediately before the challenged passage:

> "We are here to sentence Mr. Brisbon to death because he was serving a sentence for murder in the Department of Corrections and killed again. I cannot stress that to you enough. That is the only reason we are here. He was serving a sentence for murder and he killed again. Mr. Brisbon was serving six separate sentences and he killed again."

When the challenged passages are viewed in the context of these words, it becomes clear that the prosecutor was asking the jury to consider the defendant's criminal history and lack of positive response to his incarceration when making its decision. We find that the prosecutor's remarks were permissible and not analogous to the statements made in *Holman*.

The defendant next objects to the following remarks of the prosecutor made during rebuttal in response to a defense plea for mercy:

> "I am going to ask if you, any of you search your hearts and find that there is any mercy in there for the Defendant, that before you exercise mercy on his behalf, that you think about the people who begged him for their lives—."

Counsel for the defense objected to this argument, which the court sustained, and the jury was instructed to disregard these comments. Brisbon contends that these remarks constituted reversible error for two reasons.

First, Brisbon contends that the prosecutor's remarks on the quality of mercy that the jury should accord the defendant were an expression of the prosecutor's own personal opinion and were designed to inflame the passions and prejudices of the jury. Second, Brisbon contends that these remarks asked the jury to execute the defendant for the "I-57" murders, and not for the murder of "Hippie" Morgan. Brisbon, relying upon this court's decision in *People v. Hope* (1986), 116 Ill. 2d 265, maintains that the implied references to the I-57 murders constituted reversible error because they were irrelevant, highly prejudicial, and were based upon a nonstatutory aggravating factor.

We do not find Brisbon's arguments persuasive. As we have stated many times in past decisions, we note once again that a high standard of procedural accuracy is required in determining whether the death penalty should be imposed. (See *People v. Hope* (1986), 116 Ill. 2d 265, 274; *People v. Walker* (1982), 91 Ill. 2d 502, 517.) We do not, however, find that the remarks constituted error. The prosecutor's language about the quality of mercy that the jury should afford the defendant was objected to by defense counsel, the trial judge sustained the objection, and the jury was told to disregard the comment. Thus, any harm that may have resulted from the prosecutor's remarks was cured. We also note, however, that the prosecutor's remarks were made during the second phase of the sentencing hearing, where evidence of the defendant's previous offenses and character are admissible for the purposes of balancing aggravation and mitigation. (See Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(c), (d).) This court has elaborated upon the admissibility of evidence pertaining to the defendant's past conduct, stating:

" 'The rules of evidence which ordinarily obtain in a trial where guilt is denied do not bind the court in its inquiry.

It may look to the facts of the [crime], and it may search anywhere, within reasonable bounds, for other facts which tend to aggravate or mitigate the offense. In doing so it may inquire into the general moral character of the offender, his mentality, his habits, his social environments, his abnormal or subnormal tendencies, his age, his natural inclination or aversion to commit crime, the stimuli which motivate his conduct and *** [citation] the judge should know something of the life, family, occupation and record of the person about to be sentenced.' " *People v. La Pointe* (1981), 88 Ill. 2d 482, 495, quoting *People v. Adkins* (1968), 41 Ill. 2d 297, 301.

The defendant's earlier crimes and his conduct during incarceration relate to the balance of aggravation and mitigation and meet the requisite criteria set forth in the quotation above. Thus, we find that none of the prosecutor's statements constitute reversible error.

The defendant next argues that testimony which suggested that he had received a prior death sentence constituted reversible error. This testimony occurred during the second phase of the sentencing hearing when the defense called William Jones, an inmate at the Pontiac Correctional Center, to rebut the State's evidence that Brisbon had previously stabbed Jones. On cross-examination, the State sought to impeach Jones' testimony, and the following exchange occurred:

"Q. Mr. Jones, the murder to which you're convicted of, you committed that murder?

A. No, I did not.

Q. And you're sentenced to death, is that correct?

A. Yes, for the present time.

Q. Now, you say you were in Menard from '82 to '85?

A. Yes.

Q. Now, you wouldn't come in here and lie to the ladies and gentlemen of the jury about anything, would you?

A. No, I would not, because I don't want to see Henry get the death penalty again.

Q. And you wouldn't lie because of that, right?

A. No.

Q. Now, isn't it a fact that in February of 1983, that you received treatment by the doctor at the prison facility for stab wounds to your left shoulder and your forehead?"

Defense counsel did not object to this testimony at that point. On the following day, however, the defense moved for a mistrial. Although the court denied the motion, it noted that defense counsel had acted correctly by not objecting to the testimony and thereby calling the jury's attention to the word "again" and to the logical conclusion that the defendant had received a prior death sentence. The State contends that the prosecutor did not elicit the prior death sentence information and could not have reasonably expected that Jones would volunteer the information. Based upon our review of the record, we agree that the testimony was elicited inadvertently and does not warrant reversal.

Defendant Brisbon relies upon our decisions in *People v. Davis* (1983), 97 Ill. 2d 1, and *People v. Hope* (1986), 116 Ill. 2d 265, to support his argument that any evidence that suggests a prior death sentence constitutes grounds for reversal. In effect, the defendant interprets these decisions as articulating a *per se* rule. The facts in the instant case, however, are readily distinguishable from those that arose in *Davis* and in *Hope*. In *Davis*, the jury was informed that the defendant had received a death sentence for an unrelated murder. (*Davis*, 97 Ill. 2d at 25-26.) This information was admitted during the first phase of the sentencing hearing. (97 Ill. 2d at 25.) In order to establish the necessary aggravating factor that the defendant had murdered two or more individuals, the prosecution introduced two certified copies of

the defendant's murder convictions. These copies contained the jury's verdict that the defendant should be sentenced to death. (97 Ill. 2d at 25.) Based on these facts, this court ordered that the defendant receive a new sentencing hearing. (97 Ill. 2d at 27.) That decision was based on three considerations. First, we determined that introduction of this evidence was irrelevant during the first phase of the sentencing hearing because this phase determines the defendant's eligibility to receive the death sentence, not whether, in view of his character and record, he should receive the death sentence. Thus, the fact that the defendant had previously received a death sentence had no relevance to the determination of whether he was eligible to receive the death sentence in the current case. See 97 Ill. 2d at 26.

Our second consideration in *Davis* was that if the jury became aware that a previous jury had imposed the death sentence, it may have been improperly influenced by this information. (97 Ill. 2d at 26.) A juror who was uncertain as to whether the defendant was eligible to receive the death sentence may have been swayed by knowledge of the previous jury's action.

Finally, this court concluded:

> "[T]he jury's awareness of defendant's prior death sentence would diminish its sense of responsibility and mitigate the serious consequences of its decision. Assuming that defendant was already going to be executed, the jurors may consider their own decision considerably less significant than they otherwise would." *Davis*, 97 Ill. 2d at 26.

In the second case that the defendant relies upon, *People v. Hope* (1986), 116 Ill. 2d 265, 273, news reports appearing at the time of the defendant's sentencing hearing contained specific information that the defendant had been sentenced to death for killing a police officer. At the beginning of the trial, the trial judge had de-

nied the defendant's motion to sequester the jury and had instead instructed the jurors not to read or listen to the news media reports giving information about the case. (116 Ill. 2d at 271.) During the sentencing hearing, however, the judge withdrew this instruction, stating: "And as far as reading the papers, it won't make any difference—make any difference now or watching television. Okay. See you tomorrow." (116 Ill. 2d at 271-72.) On the following day, counsel for the defense renewed the motion to sequester the jury and asked that an inquiry be made of the jurors to determine whether they had received information from the news media regarding the case. (116 Ill. 2d at 272.) Upon inquiry, it was determined that some of the jurors had read or heard the news reports which disclosed that the defendant had previously been sentenced to death. (116 Ill. 2d at 272.) Upon this court's review of these facts, it held that the jurors' knowledge of the defendant's previous death sentence constituted reversible error. (116 Ill. 2d at 274.) This court also noted that because the sentencing hearing was not bifurcated, there was a possibility that some of the jurors who had gained information about the case via the media may have allowed this information to color their decision throughout the entire sentencing hearing, including the issue of the defendant's eligibility for the death sentence. 116 Ill. 2d at 274.

The facts in the present case differ from those arising in *Hope* and *Davis*. In both of those cases, the jurors received specific information that the defendant had received a prior death sentence. The prosecution in *Davis* conveyed evidence of the defendant's prior death sentence by introducing the jury verdicts into evidence. In *Hope*, some of the jurors had received information through the news media that the defendant had previously been sentenced to death. In the present case, however, the information that Brisbon had received a prior

death sentence was an inadvertent response to a question asked of a witness. It was not explicit and primarily manifested itself in the single word "again." We note that both the prosecution and the defense handled the situation well. If the defense had objected to the testimony at the time it was given, it might have attracted the jury's attention to the matter. Instead, by making a motion for a mistrial on the following day outside of the jury's presence, the defense handled the situation properly. Similarly, the prosecution did not emphasize or dwell on the inadvertent response, but moved on to other aspects of the cross-examination. Thus, we conclude that the testimony that referred to the defendant's prior death sentence did not constitute reversible error.

Finally, with respect to this issue, we note that the prosecution took great care throughout the course of the proceedings to prevent introduction of, or reference to, the fact that the defendant had a prior death sentence. This was evidenced during the testimony of Michael Frazier, who had been the warden of the maximum segregation security unit at Menard Correctional Center, where the defendant was incarcerated. During cross-examination of Frazier, counsel for the defense repeatedly referred to the fact that the maximum segregation security unit actually constituted "death row." When framing his questions, counsel for the defense referred to the unit as "death row" several times, and specifically elicited testimony from Frazier that inmates incarcerated in this unit were under death sentences. In response to these repeated references to "death row," the prosecution called a side bar conference outside of the presence of the jury and the witness. During the side bar the prosecution expressed concern that defense counsel's characterization of the unit where the defendant was incarcerated as "death row" would indicate to the jury that the defendant had a previous death sentence. Both

the prosecution and the defense reached a mutually acceptable result with respect to this concern. This occurrence, however, demonstrates that the prosecution was sensitive about shielding the jury from the knowledge that Brisbon had previously been sentenced to death.

The defendant next argues that his death sentence should be reversed because certain evidence was erroneously admitted in aggravation at the second phase of the sentencing hearing. Specifically, Brisbon argues that the testimony of George C. Welbourne, who was assistant deputy warden of the Illinois Department of Corrections, and the testimony of Edward Martin, who was a guard at the Menard Correctional Center, elicited improper evidence that abrogated the defendant's fundamental constitutional guarantee that irrelevant and prejudicial matter that serves to arouse the prejudices of the jury shall not be submitted to the jury.

Welbourne testified about prison procedures and responded to questions pertaining to the defendant's conduct while incarcerated in the maximum security unit. A substantial portion of this testimony focused upon the defendant's actions and role during a prison takeover that had occurred in 1979. The defendant challenges Welbourne's testimony in three respects. First, the defendant objects to the following exchange that occurred during the prosecution's redirect examination of Welbourn:

"Q. And the food warmers, who used food warmers to heat up water to be thrown on guards' faces and wardens' faces.

MR. BJEKICH: I'm going to object."

In response to this objection from counsel for the defense, the court excused the jury and the witness. Defense counsel objected on two grounds. First, the defense argued that the prosecutor did not stop asking the question upon objection. Second, the defense argued that

the question was prejudicial and exceeded the scope of the issues raised on cross-examination. After discussion outside of the presence of the jury and the witness, the State withdrew the question and the court instructed the jury to disregard the question.

The defendant now argues that this testimony was highly prejudicial to the defendant when the State knew that Brisbon was not guilty of this conduct. Upon our review of the record, we find that the trial court's instruction to the jury to disregard the question cured whatever prejudice that may have resulted from the question.

The defendant's second contention with respect to Welbourne's testimony involves the following exchange, which occurred during the prosecution's redirect examination of the witness:

"Q: And with regard to attacking inmates, guards and destroying property, is there anyone within the Department of Corrections who is as dangerous as Henry Brisbon?

MR. BJEKICH: Objection.

THE COURT: Objection is sustained. The jury will disregard the question, please."

The defendant contends that the prosecution sought to prejudice the jury by arguing through its question that defendant Brisbon was the most dangerous inmate in the entire facility and was, thus, a dangerous man. Defendant further argues that this question resulted in the introduction of a nonstatutory aggravating factor to the attention of the jury. Our review of the record indicates that even if we were to find that the question was improper, the trial court's admonishment to the jury to disregard the question cured any defective inquiry.

The defendant's final contention with respect to Welbourne's testimony is that the entire testimony pertaining to the prison takeover was inadmissible. Defendant premises this argument on the fact that Welbourne ad-

mitted that the defendant had attempted to stop the disarray and that the defendant had not been convicted of any crime arising out of the incident. Relying upon this court's decision in *People v. Lindgren* (1980), 79 Ill. 2d 129, 137, defendant argues that the testimony pertaining to the prison uprising constitutes impermissible evidence of a collateral crime that only serves to overpersuade the jury to convict the defendant because he is a bad person. While we agree that the defendant has recited a correct rule of law with respect to collateral crimes, it is inapplicable in the present case.

The present case, unlike the *Lindgren* case cited by the defendant, involves a sentencing hearing in a death penalty case. Further, Welbourne's testimony was introduced during the second or aggravation portion of the hearing, where the defendant's conduct and potential for rehabilitation were at issue. The Illinois death penalty statute provides that "[t]he court shall consider, or shall instruct the jury to consider any aggravating and any mitigating factors which are relevant to the imposition of the death penalty." (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c).) Section 9—1(e) states that "[a]ny information relevant to any additional aggravating factors or any mitigating factors indicated in subsection (c) may be presented by the State or defendant regardless of its admissibility under the rules governing the admission of evidence at criminal trials." Ill. Rev. Stat. 1983, ch. 38, par. 9—1(e).

Our past interpretations of these provisions provide that when determining admissibility of evidence during this phase of a sentencing hearing, the only requirement is that the evidence be relevant and reliable. (*People v. Free* (1983), 94 Ill. 2d 378, 422; *People v. La Pointe* (1981), 88 Ill. 2d 482, 498.) Evidentiary rules are waived at this stage because it is important that the sentencing authority possess the fullest information possible with

respect to the defendant's life, character, criminal record and the circumstances of the particular offense. (*Woodson v. North Carolina* (1976), 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978; *People v. La Pointe* (1981), 88 Ill. 2d 482, 496.) When viewed in this context and when Welbourne's entire testimony is examined closely, it becomes clear that the testimony with respect to the prison uprising was relevant and admissible during the aggravation phase of the sentencing hearing.

The defendant further argues that the testimony of Edward Martin, a guard at Menard Correctional Center, was speculative and unsupported by the evidence. Martin testified about witnessing the defendant stab another inmate, William Jones. Defendant argues that there was no evidence that Martin ever observed the stabbing or that Jones was actually stabbed. The defendant contends that the fact that Jones later testified that he was not stabbed by the defendant and that the prosecution never introduced medical records to prove that the stabbing occurred precludes Martin's testimony. We disagree. The record clearly indicates that Martin testified that he observed the stabbing incident. The defendant was given ample opportunity to cross-examine Martin. Although Jones testified that the incident did not occur, it was the jury's function to determine the credibility of the witnesses and accord the appropriate weight in aggravation. *People v. Akis* (1976), 63 Ill. 2d 296; *People v. Zuniga* (1973), 53 Ill. 2d 550.

The defendant also argues that the constitutional assurances against double jeopardy barred the State from seeking the death penalty in this case. Relying upon the United States Supreme Court decision in *Oregon v. Kennedy* (1982), 456 U.S. 667, 72 L. Ed. 2d 416, 102 S. Ct. 2083, and this court's decision in *People v. Ramirez* (1986), 114 Ill. 2d 125, the defendant argues that the State's conduct in both the first sentencing

hearing and the resentencing hearing was so egregious on its face that it manifested an intent to provoke a mistrial. Therefore, the defendant argues, the State was barred from proceeding with the instant sentencing hearing under the constitutional guarantee against double jeopardy. The defendant specifically points to the prosecution's use of parole considerations, use of statistics to show the deterrent value of the death penalty, and mention of the I-57 murders during the first sentencing hearing to demonstrate the State's intent to provoke a mistrial. Although some of the prosecutor's conduct during the first sentencing hearing mandated a new sentencing hearing, we do not find that the principles of double jeopardy are applicable in this case and, accordingly, reject the defendant's argument.

The double jeopardy clause of the fifth amendment to the United States Constitution protects a defendant in a criminal proceeding against multiple punishments for the same offense. (*United States v. Dinitz* (1976), 424 U.S. 600, 606, 47 L. Ed. 2d 267, 273, 96 S. Ct. 1075, 1079.) "Only[, however,] where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." (*Oregon v. Kennedy* (1982), 456 U.S. 667, 676, 72 L. Ed. 2d 416, 425, 102 S. Ct. 2083, 2089.) Further,

> "a standard that examines the intent of the prosecutor, though certainly not entirely free from practical difficulties, is a manageable standard to apply. It merely calls for the court to make a finding of fact. Inferring the existence or nonexistence of intent from objective facts and circumstances is a familiar process in our criminal justice system. ***
>
> Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar re-

trial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause." *Oregon v. Kennedy* (1982), 456 U.S. at 675-76, 72 L. Ed. 2d at 424, 102 S. Ct. at 2089.

This court examined and followed the standard of intent which the *Kennedy* Court articulated in *People v. Ramirez*, where this court stated:

> "The Supreme Court, in *Oregon v. Kennedy* (1982), 456 U.S. 667, 72 L. Ed. 2d 416, 102 S. Ct. 2083, made clear that prosecutorial misconduct is a very narrow exception to the general holding that the guaranty against double jeopardy does not bar retrial following a reversal because of trial errors. The Supreme Court in *Kennedy*, specifically rejecting a more generalized standard of 'bad faith conduct' or 'harassment' in judging whether a mistrial was provoked, held that the error must disclose the prosecutor's *intent* to provoke a motion for a mistrial." (Emphasis in original.) *People v. Ramirez* (1986), 114 Ill. 2d 125, 130.

We do not find that the prosecutor's conduct during the first sentencing hearing disclosed an intent to provoke a mistrial. Thus, consistent with both the Supreme Court's holding in *Kennedy*, and this court's holding in *Ramirez*, we hold that principles of double jeopardy did not bar the State from proceeding with the second sentencing hearing.

The defendant argues that the trial court erred in excluding the testimony of James Foster, who had been an inmate at the Stateville Correctional Center at the time of "Hippie" Morgan's death. During the second phase of the sentencing hearing, the defense sought to introduce Foster's testimony in mitigation. The defense made an offer of proof on the record by calling Foster to testify outside the presence of the jury. Foster testified that a fellow inmate had told him that Herman Morgan, also known as "Sawed-Off," was actually responsible for "Hippie" Morgan's death. Foster further testified that

although he had not observed the incident, three other inmates who had observed the murder had stated that the defendant did not stab "Hippie" Morgan. Foster stated that the defendant was part of the armed group that surrounded the victim, but stated that the defendant did not possess the weapon that struck the mortal wound. Because Foster had not observed the stabbings, he was testifying to hearsay that he had obtained through his own investigation.

Upon hearing Foster's testimony, the trial judge granted the prosecution's motion *in limine* to exclude the testimony. The trial judge based this decision on the fact that although sentencing hearings are more liberal in terms of evidence admitted, the evidence must be relevant and reliable. In the present case, the trial judge believed that Foster's testimony was not reliable and was inconsistent with the physical evidence presented.

On appeal, the defendant argues that his level of participation in the murder was an appropriate factor in mitigation and that because Foster's testimony was not presented to the jury, the defendant's death sentence should be vacated. In support of this argument, the defendant cites this court's decision in *People v. Perez* (1985), 108 Ill. 2d 70. In *Perez*, the defendant was an inmate at Stateville Correctional Center who was charged with murdering a fellow inmate. At closing argument during the eligibility phase, counsel for the defense stated that the defendant "[might] not have been the one that inflicted the [fatal] wounds." Thus, the defendant attempted to introduce evidence that although he was a participant in the murder, he did not strike the blow that caused the victim's death. This court held that evidence indicating that the defendant did not inflict the fatal wound "was a mitigating factor which could properly be argued during the second phase as militating against the imposition of the death penalty." (*Perez*, 108 Ill. 2d at

85.) We held, however, that because defense counsel's argument occurred during the eligibility phase, the court did not err in sustaining the State's objection to this argument. 108 Ill. 2d at 85.

*Perez* is inapplicable in the present case. At issue here is the reliability and relevancy of the proffered testimony. As we have stated on many occasions, "the factors controlling the admission of evidence at the second stage of the sentencing hearing are relevancy and reliability, the determination of which lies within the sound discretion of the trial judge." (*Perez*, 108 Ill. 2d at 88; see also *People v. Lyles* (1985), 106 Ill. 2d 373, 414; *People v. Free* (1983), 94 Ill. 2d 378, 423-24.) While the language that the defendant relies upon in *Perez* denotes the relevancy of who struck the fatal blow as a mitigating factor, the reason the trial court did not allow Foster's testimony was because it was unreliable. In the present case, the trial judge concluded after hearing Foster's testimony that the testimony was unreliable. Given the fact that Foster did not actually observe the stabbing, but instead based his testimony upon the results of his own "investigation," which, as the trial judge concluded, was inconsistent with the physical evidence presented, we cannot conclude that the trial judge erred by granting the prosecution's motion *in limine* to exclude Foster's testimony.

The defendant's next argument is that the Illinois death penalty statute (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)) is unconstitutional because it allows prosecutors unbridled and arbitrary discretion in choosing whether to seek the death penalty. The defendant contends that this discretion violates the eighth and fourteenth amendments to the United States Constitution and article II, section 1, of the Illinois Constitution. We have addressed these arguments on several occasions and have concluded that the statute satisfies constitutional guaran-

tees. (See, *e.g., People v. Orange* (1988), 121 Ill. 2d 364, 390; *People v. Erickson* (1987), 117 Ill. 2d 271, 304; *People v. King* (1986), 109 Ill. 2d 514; *People v. Guest* (1986), 115 Ill. 2d 72; *People v. Stewart* (1984), 104 Ill. 2d 463.) The defendant has presented no compelling arguments that warrant reversal of these decisions.

We are aware of the opinion of the United States District Court for the Central District of Illinois, filed April 29, 1989, in the case of the *United States ex rel. Silagy v. Peters*, No. 88—2390. In that case the court held the Illinois death penalty statute (Ill. Rev. Stat. 1979, ch. 38, par. 9—1) unconstitutional. In passing on Federal constitutional questions, State courts and lower Federal courts have the same responsibility and occupy the same position. Until the Supreme Court of the United States has spoken, State courts are not precluded from exercising their own judgments on Federal constitutional questions. Because lower Federal courts exercise no appellate jurisdiction over State courts, decisions of lower Federal courts are not conclusive on State courts, except insofar as the decision of the lower Federal court may become the law of the case. *United States ex rel. Lawrence v. Woods* (7th Cir. 1970), 432 F.2d 1072; see also *City of Chicago v. Groffman* (1977), 68 Ill. 2d 112; *People v. Stransberry* (1971), 47 Ill. 2d 541.

The defendant argues that at the new sentencing hearing, the trial court judge erroneously excluded two venire members from the jury for cause, in violation of *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770. The *Witherspoon* decision and its progeny provide that the right to an impartial jury under the sixth and fourteenth amendments to the United States Constitution prohibits the exclusion of venire members for cause in capital cases unless their stated opposition to the death penalty would prevent or substantially impair the performance of their duties as ju-

rors. The defendant further relies upon language in the Supreme Court decision of *Lockhart v. McCree* (1986), 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149-50, 106 S. Ct. 1758, 1766, where the Court stated:

"It is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law."

The defendant argues that the exclusion of two venire members in the present case violates the rule set forth in *McCree*. Defendant further argues that because these two venire members were erroneously excluded, his death sentence must be vacated under *Davis v. Georgia* (1976), 429 U.S. 122, 50 L. Ed. 2d 339, 97 S. Ct. 399 (holding that exclusion of potential juror who qualifies under *Witherspoon* requires vacation of death sentence), and under *Gray v. Mississippi* (1987), 481 U.S. 648, 666, 95 L. Ed. 2d 622, 638, 107 S. Ct. 2045, 2056 (holding that *Witherspoon* violations constitute reversible constitutional error and cannot be subjected to harmless error review). We do not agree with the defendant's argument and after reviewing the record in this case, we find that the two potential jurors were properly excused for cause.

The defendant first objects to the exclusion of venire member Bergmann. The transcript of the proceedings demonstrates that both the court's and the prosecutor's questioning of Bergmann uncovered her indecisiveness with respect to the imposition of the death penalty. At the end of the questioning the following exchange occurred:

"MR. WHITE: Can you, when you get back to the jury room, can you sign a form that would sentence a

person to death? Can you put your name on that verdict form which says this person should be sentenced to death?

MS. BERGMANN: No."

The prosecutor moved to exclude Bergmann on the grounds that she would not be able to sign a death warrant form, and was thus excludable under *Witherspoon*. Over an objection by the defense, the court excused Bergmann for cause.

The defendant also argues that the exclusion of venire member Stevak was in violation of *Witherspoon* and constitutes grounds for vacation of the death sentence. At the end of the questioning by the court, the prosecution and the defense, the following exchange occurred upon questioning by counsel for the defense:

"MR. BJEKICH: I sense your answer is at this point you don't know what you are going to do. But let's for a hypothesis say you have heard all the evidence, you have heard all the testimony, and you are deliberating this case back in the jury room, and you have come to that decision in your mind that the death penalty should be imposed. You have been convinced of that. There's no longer any question in your mind, you feel that the death penalty should be imposed. At that point would you sign the verdict sheet saying that, 'I believe he should get the death penalty'?

MS. STEVAK: No, I don't want to be responsible for that."

The prosecutor moved that venire member Stevak be excused for cause. Over objection by the defense, Stevak was excused.

Our examination of the record, especially of the questioning of venire members Bergmann and Stevak quoted above, demonstrates to us that the defendant's argument that these two potential jurors were erroneously excluded must fail. Both Bergmann and Stevak stated that they would be unable to sign death verdict forms.

The standard for excusing jurors for cause because of their opposition to capital punishment "is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt* (1985), 469 U.S. 412, 420, 83 L. Ed. 2d 841, 849, 105 S. Ct. 844, 850, quoting *Adams v. Texas* (1980), 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589, 100 S. Ct. 2521, 2526; see also *People v. Emerson* (1987), 122 Ill. 2d 411, 438.) The two venire members' professed inability to sign the death warrant forms and thus impose the death penalty in the instant case indicate that they would not be able to meet this requisite standard. Additionally, these two potential jurors' responses to questioning fall short of the requirement articulated by the United States Supreme Court in *Lockhart v. McCree* (1986), 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149-50, 106 S. Ct. 1758, 1766, that potential jurors who believe that the death penalty is unjust may not be excluded "so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." Finally, we must emphasize that the trial court judge is entitled to deference in removing a potential juror for cause "given the superior position of the trial judge to gauge the meaning of the prospective juror's responses to the questions that were asked." (*People v. Emerson* (1987), 122 Ill. 2d 411, 439; see also *People v. Collins* (1985), 106 Ill. 2d 237, 280; *People v. Stewart* (1984), 104 Ill. 2d 463, 486.) Accordingly, we hold that Bergmann and Stevak were properly excused for cause.

The defendant argues that his sentence should be vacated, contending that the trial court erred when it concluded that he had not established a *prima facie* case of discrimination under the principles enunciated by the United States Supreme Court in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. In

the alternative, the defendant argues that the *Batson* hearing was "fatally flawed" and that this court should remand the cause for a new *Batson* hearing. Based upon our review of the record and the applicable law, we reject both of these arguments.

Subsequent to the defendant's second sentencing hearing and during the pendency of this appeal, the United States Supreme Court decided *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. The *Batson* Court stated that the "Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." (*Batson*, 476 U.S. at 89, 90 L. Ed. 2d at 83, 106 S. Ct. at 1719.) The Court further noted that the then-existing burden of proof (see *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824) and its various interpretations had "placed on defendants a crippling burden of proof, [and as a result,] prosecutors' peremptory challenges are now largely immune from constitutional scrutiny." (*Batson*, 476 U.S. at 92-93, 90 L. Ed. 2d at 85, 106 S. Ct. at 1720-21.) The Court articulated the appropriate standard for enabling a defendant to establish a *prima facie* case of purposeful discrimination in the context of *voir dire*:

> "To establish such a case, the defendant first must show that he is a member of a cognizable racial group [citation] and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' [Citation.] Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice

to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.

\*\*\*

Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors. \*\*\*

\*\*\* The prosecutor \*\*\* must articulate a neutral explanation related to the particular case to be tried. The trial court then will have the duty to determine if the defendant has established purposeful discrimination." *Batson*, 476 U.S. at 96-98, 90 L. Ed. 2d at 87-89, 106 S. Ct. at 1723-24.

The Court described the function of the trial court within the context of the hearing, stating:

"In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." *Batson*, 476 U.S. at 96-97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.

The Supreme Court further stated that "[s]ince the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21.

The Supreme Court later announced that the standard enunciated in *Batson* applies retroactively to all cases that were pending on direct review and were not yet final. (*Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708.) The present appeal falls under the *Griffith* criteria and, thus, is to be reviewed according to the *Batson* standard. Accordingly, on October 26, 1987, this court, pursuant to its supervisory authority (see 107 Ill. 2d R. 383), directed the circuit court of Will County to conduct an expedited hearing, in accordance with the *Batson* decision, to permit the defendant to present evidence to substantiate his claim of unconstitutional discrimination in the exercise of peremptory challenges.

On remand, the trial court found that the defendant had not met the burden required by *Batson* in making out a *prima facie* case of racial discrimination in the prosecution's exercise of its peremptory challenges. The record and the briefs in the present case indicate that the venire pool consisted of 3 blacks, 61 whites, and 1 Mexican. Of the three black venire members, the prosecution excused Randall and Caldwell, and the defense excused the third black venire member, Hamblin. When the trial judge asked the State to furnish reasons for excluding Randall and Caldwell, the prosecutor replied:

"Judge, Mr. Randall was excused because of his evasive pattern of answering the questions. He was confused as to the difference between a victim of a crime and a person convicted of a crime. *** He told me that he did not know what a public opinion poll was. He was evasive in his answering of questions about his opinion on the death penalty. He told me at one point that he really had no opinion and wouldn't give it to us. He had originally stated that he did not want to serve on the jury, and then after a break when he had come back after lunch, because of work reasons, he said he changed his mind. We did not believe that Mr. Randall was the kind of depend-

able juror that we thought would vote in a clear and concise way based on the evidence.

Likewise with Mrs. Caldwell. She was physically shaking the whole time that she was in the courtroom. Although after great hesitation she eventually—which was noticed by the State and the Defense in the questioning of her—did give answers in regards to the death penalty. But we did not feel because of her physical uncomfort with the matter before the Court and her nervousness of being placed in a situation that she would be able to again likewise handle the evidence in the duty she had before her because of that.

Those are the reasons that we struck those two jurors."

The trial court's determination that the defendant had failed to establish a *prima facie* case of purposeful discrimination is a finding of fact and will not be overturned on review unless it is found to be against the manifest weight of the evidence. (See *People v. McDonald* (1988), 125 Ill. 2d 182, 199, citing *Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21.) It appears that the judge conducted what might be called a consolidated proceeding. Instead of first determining whether a *prima facie* case of discrimination had been made and then asking the State to present neutral explanations, the judge apparently considered the entire record, as well as the prosecutor's explanations, in deciding that a *prima facie* case of discrimination had not been established. We have carefully examined the record and do not find that the trial court's decision on this issue is against the manifest weight of the evidence. We do not find a "pattern of strikes" of potential black jurors or questions during *voir dire* asked by the prosecutor that would indicate purposeful racial discrimination. See *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723; see also *People v. Evans* (1988), 125 Ill. 2d 50, 65 (listing other crite-

ria that may give rise to an inference of purposeful discrimination).

The defendant's final argument in this appeal is that the trial court erred in quashing the subpoenas that the defendant had served upon the two prosecutors. Prior to the *Batson* hearing, the defendant served subpoenas upon Edward Burmilla and Stephen White, the assistant State's Attorneys who had prosecuted the sentencing phase of the defendant's trial. The subpoenas compelled the prosecutors' testimony and the production of any and all notes made by the prosecutors during the jury selection process. At the hearing the prosecutors filed a motion to quash the subpoenas. The court granted the State's motion and did not require the prosecutors to testify or to produce their notes. After this ruling, however, although it is unclear in the record, it appears that the State voluntarily produced the notes.

This court recently held in *People v. Young* (1989), 128 Ill. 2d 1, 25, that the *Batson* decision did not intend that the prosecutor become a witness at the *Batson* hearing. Thus, this argument has been disposed of and it is not necessary to address it in depth. With respect to the defendant's argument that the trial court's granting of the motion to quash the subpoena to produce the prosecutor's notes was in error, we note that the defense counsel was provided with these notes at the hearing. Therefore, because this issue is moot and because it is not our function to issue advisory opinions, we will not address this argument.

For the reasons stated above, we affirm the judgment of the circuit court of Will County. We hereby direct the clerk to enter an order setting Tuesday, November 21, 1989, as the date on which the sentence of death entered by the circuit court of Will County shall be executed. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Crimi-

nal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A certified copy of this order shall be transmitted by the clerk of this court to the Director of Corrections, to the warden at Stateville Correctional Center, and to the warden of the institution wherein the defendant is confined.

*Judgment affirmed.*

JUSTICE CALVO took no part in the consideration or decision of this case.