(No. 58037.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. EDGAR HOPE, JR., Appellants.

*Opinion filed May 30, 1990.—Rehearing denied October 1, 1990.*

434

Charles M. Schiedel, Deputy Defender, and Gary S. Rapaport, Assistant Defender, both of Springfield, and Steven Clark, Assistant Defender, of Chicago, all of the Office of the State Appellate Defender, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert and Terence M. Madsen, Assistant Attorneys General, of Chicago, and Joan S. Cherry, Timothy J. Frenzer, Inge Fryklund and David A. Cuomo, Assistant State's Attorneys, of counsel), for the People.

JUSTICE STAMOS delivered the opinion of the court:

Defendant, Edgar Hope, Jr., was tried by a jury in the circuit court of Cook County and convicted of murder, attempted murder, and armed violence. (Ill. Rev. Stat. 1981, ch. 38, pars. 8—4, 9—1(a)(1), 33A—2.) The jury had no black members; defendant is black; and the two victims of his most serious crimes were white, both of them police officers. After a sentencing proceeding before the same jury, which determined that there were no mitigating factors sufficient to preclude imposition of a death sentence, the court sentenced defendant to death on the murder conviction. No sentences were imposed for the other convictions. Defendant took a direct appeal to this court. Ill. Const. 1970, art. VI, §4(b); Ill. Rev. Stat. 1981, ch. 38, par. 9—1(i); 107 Ill. 2d Rules 603, 606.

By an order of May 1, 1987, while this cause was pending, we directed the trial court to conduct a hearing to determine whether the State had unconstitutionally discriminated on the basis of race when it peremptorily challenged venire members. The order was entered pursuant to our supervisory authority and on our own motion, the hearing was to be conducted in accordance with the teachings of *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, the trial court was to make and file appropriate findings of fact and conclusions of law, and we retained jurisdiction. See *People v. Hooper* (1987), 118 Ill. 2d 244 (similar order); see also

*People v. Andrews* (1989), 132 Ill. 2d 451, 461-62 (citing similar cases).

The scope of our review now includes the *Batson* proceedings. A transcript of those proceedings, but no specific written findings of fact or conclusions of law, was filed by the trial court with the clerk of this court. The central *Batson* issue is whether the trial court erred in holding that defendant failed to make a *prima facie* case of purposeful racial discrimination in jury selection and that no such discrimination occurred.

For the reasons that follow, we affirm on the *Batson* issue and affirm defendant's convictions but vacate his sentence and remand the cause.

## I. FACTS

### A. THE CRIMES

At about 10 p.m. on February 5, 1982, defendant was boarding a Chicago Transit Authority bus at 79th Street and the Dan Ryan Expressway in Chicago when he was seen by Charles Harris, who had filed a robbery complaint against him several months earlier. There was an outstanding warrant for defendant's arrest. Harris told two nearby police officers, James Doyle and Robert Mantia, that defendant was on the bus. The officers and Harris drove the short distance to where the bus was then stopped, near the intersection of 79th Street and Lafayette Avenue. Harris identified defendant and pointed out where he was sitting, at the back. The two officers boarded the bus; defendant was searched briefly. As Officer Doyle was following defendant toward the front to remove him, defendant suddenly turned and fired a handgun. He shot and killed Doyle and then fired at Mantia, who was at the back of the bus searching another person. Two passengers, Kevin Paige and Cynthia Houston, were injured by defendant's gunfire. Mantia

pursued defendant and, after more shots were fired, captured him outside the bus.

At trial, defendant admitted firing the shots that killed the officer and wounded the passengers. He raised as a defense his drugged condition, and the only contested issue at trial was his mental state at the time in question. Defendant testified that he had been drinking alcohol, smoking marijuana, and ingesting cocaine in the hours preceding the occurrence. Dr. Edward Senay, a physician, testified in defendant's behalf as an expert witness. Based on what defendant had told him regarding his use of drugs and intoxicants, Dr. Senay was of the opinion that defendant had been moderately to severely intoxicated at the time in question and that his judgment had been mildly impaired. Dr. Senay also testified that, despite the intoxication, defendant had known what he was doing and had acted intentionally. Other witnesses testified variously that defendant did or did not appear to be intoxicated on the bus or after the shooting.

## B. THE 1982 JURY SELECTION

In the 1982 selection of defendant's jury, the State exercised 11 peremptory challenges, five of which were used to exclude all those venire members called for *voir dire* who were black and not otherwise excluded. (A sixth black member was excused for cause.)

While hearing defendant's first motion for a mistrial based on allegedly systematic exclusion of black venire members, the trial judge permitted the State to offer explanations *in camera* for its earlier peremptory challenges of such members, stating that he was doing so "just for the sake of the record" and adding his observation that "[a] couple of them were out and out bums, to say the least." In explaining his latter comment, the trial judge stated that one was "unemployed and never really worked anywhere," that he did not believe "any-

body in his right mind would have taken that juror," but that the State could "give the reasons for what it's worth." The State thereupon offered explanations for the peremptory challenges at issue, and the trial judge implicitly denied the mistrial motion.

### 1. The First Four Disputed Challenges

At this point in the trial, four black venire members had already been peremptorily challenged by the State.

#### a. The challenged venire members

*Gay.* The first such member was Gayle Gay, who was a 24-year-old telephone operator with 2½ years' tenure and was married to a Navy airman with six years' service. She had lived in the same neighborhood for more than six years, had no children, was well dressed, belonged to the Brethren faith, and did not attend church regularly. She had been the victim of a burglary for which no arrest had been made. With regard to the burglary, the following exchange occurred during her *voir dire*:

> "Q. Is there anything about that that you feel would affect your ability to give both sides a fair trial?
> A. Yes.
> Q. Why?
> A. Is there any reason why I—
> Q. The fact you have been burglarized, would that affect your ability to give both sides a fair trial?
> A. Oh, no."

*Franklin.* The second such venire member was Kenneth Franklin, who was 21 years old, had lived at his current address for 20 years, was single and unemployed, and was living with his unemployed mother. He had once worked at a restaurant for nine months.

*Buckley.* The third such venire member was Roger Buckley, who had never been married, was living with his parents, and was employed as a supervisor at a State

medical center where he had worked for 5½ years. He had custody of his eight-year-old daughter, whose mother lived separately and was receiving public assistance. Before his current employment, he had worked for two years as a clerk. Buckley's brother was a drug abuse counselor and a former police officer. Buckley had once witnessed a burglary to his father's car, had testified in court, and was satisfied with the results of the case. He was a Baptist and did not attend church regularly.

*Bartlett.* The fourth such venire member was Louise Bartlett, who was separated from her husband and had lived at her current address for 36 years. She had been employed for three years as a wrapper in a factory. Her husband had worked in a paint factory when they lived together. She had six adult children, who ranged in age from 19 to 36 years and included a single housewife, a single car-wash worker, a teacher in a public school, a married firefighter, a single city government office clerk, and a business administration student. The car of one of her sons had once been burglarized, for which no one had been arrested. When first asked whether she belonged to any clubs or organizations, she replied, "The Defenders," but when later asked again, she replied, "No." She was a Baptist and attended church regularly. The transcript suggests that her interrogator had some difficulty in hearing her responses to questions and that on one occasion she had to be asked a question twice before giving a responsive answer.

### b. The State's 1982 explanations

*Gay.* In attempting to explain the peremptory challenge of Gayle Gay that had occurred earlier in the day, a prosecutor said, "I'm trying to think who she was, Judge," and the other prosecutor said, "I don't recall that individual in particular, Judge. We have excused at least ten and I don't recall everybody we have excused."

The trial judge then said, "The reason why I would not choose that juror, as far as I'm concerned, is, she's a young black lady about the same age as the defendant. That's why I would have excused her."

*Franklin.* In regard to Kenneth Franklin, to whose former restaurant employment defense counsel had referred, a prosecutor remarked, "Obviously, he was chasing cockroaches for a couple of months," and the other prosecutor added, "That's the only job he ever had. He could hardly talk to you."

*Buckley.* Before giving the State an opportunity to explain the peremptory challenge of Roger Buckley, the trial judge remarked, "Buckley, there's no question." Later, when actually explaining their challenge to Buckley, the prosecutors recalled (erroneously) that "he's some kind of counselor," "[h]e works for some kind of drug abuse unit," adding that he was of defendant's age, had never been married, and had an eight-year-old child.

*Bartlett.* As for Louise Bartlett, a prosecutor said that she "reacted to Your Honor's questioning as if she had no idea of what was going on." The other prosecutor later added that "[s]he could not respond to any questions you were saying. She had no idea what was going on, and that's some of the reason why—," at which point the first prosecutor interjected, "Some of the people simply cannot follow some of your instructions." At this point the trial judge remarked, "I really don't feel so far, I haven't seen an outstanding one yet." Without explicitly addressing the mistrial motion further, the court then resumed *voir dire* of venire members.

### 2. The Fifth Disputed Challenge: Facts and 1982 Explanation

*Wadley.* During the resumed proceedings, a fifth black venire member, Denise Wadley, was peremptorily challenged by the State. She had never been married,

had lived for 17 years in the same neighborhood (16 of those years with her family), and had been working as a telephone operator for five years. Earlier, she had worked three years for an optical company and five years as a post office distribution clerk. She was a Baptist and did not attend church regularly.

After Wadley was excused, defense counsel renewed their motion for a mistrial. Later, in argument on the motion after the jury had already been impaneled and sworn, a prosecutor observed that Wadley was "a single lady who lived on the South Side of Chicago. Of course, the defendant lives on the South Side of Chicago, and more significantly, Judge, our concern on that, and her age and everything else. The fact she lives alone and the fact that the address—." After an interruption by defense counsel, the prosecutor continued:

"Just this past Sunday evening, we tried to locate a witness of ours at the very same building, a witness who I believe has in fact given the Defense a statement in this case. That is a man by the name of Mr. Hardley. That witness indicated to us he would cooperate with us. He in fact stiffed us, was not there. We have no idea what he's doing in that building. If he's around, there may be contact, and in addition any possible trepidations this young lady may have."

The trial judge then remarked:

"I cannot say they systematically excluded any black jurors, because I don't really feel, for one reason or another, that we really had substantial black jurors that, you know, that I would as a trial lawyer, accept as far as this case is concerned, and the one, basically young black juror basically about the same age as the defendant. I mean, with the exception of the one older lady, I don't know how old she was, and she had children the same age, and Louise Bartlett, but I agree with the State she wasn't the sharpest juror.

I can't say they proved they systematically excluded them."

Formally denying the mistrial motion, the judge added:

"I mean, if they started excluding black jurors who basically had worked at a job for ten or twenty years and lived in the community and so forth, maybe I would say there may be something to your motion and if I followed the cases, which I question about whether it's the law in the State of Illinois, but as the law now sits, not having done so, I can't really say, per se, that they did it."

## C. THE 1987 BATSON HEARING

As noted, the proceedings just described took place in 1982. After our 1987 remand on the basis of the 1986 *Batson* decision, defendant moved for a ruling that a *prima facie* case under *Batson* existed. In support of the motion, defendant offered the 1982 *voir dire* transcript and copies of relevant juror information forms completed by venire members.

On submission of the 1987 motion for a *Batson* ruling, the trial judge called on the State to "supplement the record," remarking:

"When the [1982] motion was made I did go into it. I gave reasons why I did not think at that time they were excluded because of race.

I basically said for the record what I thought. However I can't read the State's mind.

The State can tell me for the record what they had in mind, if they remember."

A trial prosecutor, declaring that the State was not conceding that defendant had made out a *prima facie* case, then proceeded to set out reasons for the State's peremptory challenges.

### 1. The State's 1987 Explanations

*Gay.* In regard to Gayle Gay, the prosecutor said that "the first thing that came to our mind" was that she

was a victim of an unsolved felony and that she had been peremptorily challenged "because among other reasons, primarily because" of that fact. The prosecutor argued that five other venire members who were not black had been excused for similar reasons.

At that point, defense counsel said that he had understood that the court would first rule on whether a *prima facie* case had been established. The trial judge replied:

> "I ruled at the time I did not find it. That's the reason I ruled the way I did at the time.
>
> Now I want him to supplement the record. Afterwards you can supplement the record, anything you have contrary to what the State said, and we will send the record out."

The prosecutor then observed that initially Gay had also said that the unsolved crime might affect her ability to be impartial. He asserted that, though she had corrected herself, the State had obviously felt concern.

*Buckley.* In regard to Roger Buckley, the prosecutor said that Buckley's brother had left law enforcement to become a drug abuse counselor, that one of defendant's attempted defenses was that he was under the influence of drugs at the time of the crimes, and that the defense had listed prospective expert witnesses regarding drug abuse. "This is something that stood out like a stoplight," the prosecutor said.

*Bartlett.* In regard to Louise Bartlett, the prosecutor cited "cumulative reasons." He first referred to her "demeanor" and said that she had "had a tough time looking at the Court" and "a tough time responding to the Court's questions." "If you look at the record on four different occasions the Court had to go back and repeat questions in order for the Court to even hear her answers," he added. The prosecutor continued by saying that, like Gayle Gay and "several white jurors who were excused for the same reason," one of Bartlett's sons had

been the victim of an unsolved burglary or robbery. "Last but not least," the prosecutor concluded, Bartlett had said that she belonged "to group or organization, quote, Defenders," which "simply did not have a strong law enforcement ring to it." The prosecutor said that the reasons for excusing Bartlett had almost amounted to cause but that the State had exercised a peremptory challenge rather than asking that she be excused for cause.

*Wadley.* In regard to Denise Wadley, the prosecutor said that she was "a younger person" and that she "was living at an address where one of the original State's witnesses was residing"—"[a] state witness that *** had apparently given a statement to the defense." "In any event, it was making it rather difficult in cooperating with the State," added the prosecutor. There was no supportive evidence in the record (and there was some contradictory evidence) as to the accuracy of the prosecutor's statement about the witness' place of residence.

*Franklin.* Finally, in regard to Kenneth Franklin, the prosecutor said that he was "a young man, about the defendant's age," that he lacked roots in the community and work experience because he was single and unemployed and his only employment had been "some type of work at a pancake house," and that he had had "difficulty speaking to the Court, understanding what was going on, apparently looking at the Court." The State cited *People v. Talley* (1987), 152 Ill. App. 3d 971, 986-87 (finding no error in trial court's denial of defendant's mistrial motion after prosecutor merely explained that he had been "not too happy" with challenged venire member's "demeanor and how he answered the questions").

## 2. The Defense's Rebuttal

Defense counsel and the trial judge then had a spir-

ited exchange over counsel's inquiry as to whether the
State would offer more evidence prior to the defense's
rebuttal. During this colloquy, defense counsel said: "The
motion I filed was a motion for you to declare a prima
facie case." To this, the judge replied:

> "The motions you filed I am putting in the file. I was
> told to conduct a hearing as I read what the Supreme
> Court told me to do, not you.
>
> You can supplement the record any way you wish
> to."

After a continuance to review the *voir dire* tran-
scripts to which the prosecution had referred, defense
counsel argued at length in rebuttal of each prosecution
explanation.

As defense counsel neared the end of his argument,
the following exchange occurred:

> "THE COURT: Let me ask you a question. The Su-
> preme Court is going to have to answer for all of us.
> Merely because the victim is white and the defendant is
> black, can you excuse him for that reason? Is that a valid
> peremptory challenge?
>
> MR. ISAACSON [assistant public defender]: Because
> the defendant is black and the victim white?
>
> THE COURT: Yes.
>
> MR. ISAACSON: I think, it is absolutely clear you
> cannot.
>
> THE COURT: I am not too sure. I ask it because I
> wish they would answer that question for me because I
> think that is the whole problem which is wrong with pe-
> remptory challenges. Proceed."

### 3. The State's Surrebuttal

At the beginning of what may be called the State's
surrebuttal argument, the prosecutor said that at the
*Batson* hearing it was the defense's obligation to prove a
*prima facie* case of discrimination, but that the absence
of black jurors alone was insufficient proof. The State

argued that its peremptory challenges were exercised against a racially mixed group of five black and six white venire members, that the defense could have used more of its peremptory challenges so that seven to eight black venire members remaining might have been reached for *voir dire*, and that the defense had not established a *prima facie* case. In addition, the State argued that it had not been obliged to follow *Batson* precepts when it offered its 1982 explanations for peremptory challenges; it did not then have the assistance of a *voir dire* transcript or even the juror information forms; and it should not be held strictly to its 1982 explanations. Finally, the State argued that, while it had articulated nonracial reasons for the peremptory challenges, the reasons were not required by *Batson* to rise to the level of cause for challenge, and the State had not claimed that the reasons articulated were the only reasons for the challenges. Thus, according to the prosecutor, "the record should be very clear that even if someone stretching the imagination could assume that the defense in this case has presented a prima facie case, which I submit no one can, that the State in this case has not violated the mandates of Batson."

At this point, the transcript reveals the following exchange:

"THE COURT: *** I ruled of course at the trial I did not see any racial excluding here. Based upon the hearing I have here, I have not changed my mind ***.

* * *

Since I ruled before, I have not changed my ruling after hearing the reasons given to me today.

MR. ISAACSON: Your Honor, could your Honor make a finding of whether or not we have established a prime [*sic*] facie case?

THE COURT: No, you did not.

MR. ISAACSON: And one further—

THE COURT: Which I ruled at the time of the trial."

## II. ANALYSIS

### A. BATSON PROCEDURE

In *Batson v. Kentucky*, the Supreme Court recognized the "important position" of peremptory challenges in trial procedure and acknowledged that generally such challenges can contribute to the administration of justice. (*Batson*, 476 U.S. at 98-99, 90 L. Ed. 2d at 89, 106 S. Ct. at 1724; see *Swain v. Alabama* (1965), 380 U.S. 202, 212-20, 13 L. Ed. 2d 759, 768-72, 85 S. Ct. 824, 831-35.) However, noting that the peremptory challenge has often been used to discriminate against black jurors, the Court declared in ringing terms that such a practice injures not only the defendant and the would-be juror but also the entire community. Intentional race-based jury discrimination weakens public respect for the justice system and the rule of law. *Batson*, 476 U.S. at 87-88, 99, 90 L. Ed. 2d at 81-82, 89, 106 S. Ct. at 1718, 1724.

Under *Batson*, a defendant's *prima facie* case of purposeful racial discrimination in jury selection may be based solely on evidence regarding the State's use of peremptory challenges in the defendant's own case. The *prima facie* case can be established by relying on the fact that the peremptory-challenge system facilitates any intended discrimination and by showing that (1) the defendant belongs to "a racial group capable of being singled out for differential treatment," *i.e.*, "a cognizable racial group"; (2) the State removed members of the defendant's race from the venire by using peremptory challenges; and (3) these facts "and any other relevant circumstances raise an inference" of purposeful discrimination because of race. *Batson*, 476 U.S. at 93-96, 90 L. Ed. 2d at 85-88, 106 S. Ct. at 1721-23.

As two "merely illustrative" examples of possible "relevant circumstances" to be considered in deciding whether a defendant has made a *prima facie* case, the *Batson* Court cited "a 'pattern' of strikes against black jurors" and "the prosecutor's questions and statements" during *voir dire* and while exercising challenges. (*Batson*, 476 U.S. at 96-97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723; see also *People v. Holman* (1989), 132 Ill. 2d 128, 172-73.) This court has also recognized that a *prima facie* case may be established if a prosecutor exercises peremptory challenges "against a group of veniremen being otherwise 'as heterogeneous as the community as a whole,' sharing race as their only common characteristic." *People v. McDonald* (1988), 125 Ill. 2d 182, 196, quoting *People v. Wheeler* (1978), 22 Cal. 3d 258, 280, 583 P.2d 748, 764, 148 Cal. Rptr. 890, 905; accord *People v. Harris* (1989), 129 Ill. 2d 123, 172-73.

As additional examples of relevant circumstances, this court and others, before and after *Batson*, have identified the disproportionate use of strikes against black persons (*People v. Mahaffey* (1989), 128 Ill. 2d 388, 413; *People v. Wheeler*, 22 Cal. 3d at 280, 583 P.2d at 764, 148 Cal. Rptr. at 905), the level of black representation in the venire as compared to the jury (*Mahaffey*, 128 Ill. 2d at 413; *People v. Evans* (1988), 125 Ill. 2d 50, 64), and the races of defendant and victim (*Mahaffey*, 128 Ill. 2d at 413; *Wheeler*, 22 Cal. 3d at 281, 583 P.2d at 764, 148 Cal. Rptr. at 906) or defendant and witnesses (*Mahaffey*, 128 Ill. 2d at 413; *United States v. Mathews* (7th Cir. 1986), 803 F.2d 325, 332, *rev'd on other grounds* (1988), 485 U.S. 58, 99 L. Ed. 2d 54, 108 S. Ct. 883).

"*Once the defendant makes a prima facie showing*, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." (Emphasis added.) (*Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723; accord *Harris*, 129 Ill. 2d at 174

("once a *prima facie* case \*\*\* has been established, the State has the burden of coming forward with a neutral explanation").) The State's neutral explanation must be "related to the particular case to be tried." (*Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1724.) In articulating that explanation, "the prosecutor must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges." *Batson*, 476 U.S. at 98 n.20, 90 L. Ed. 2d at 88 n.20, 106 S. Ct. at 1724 n.20, quoting *Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 258, 67 L. Ed. 2d 207, 218, 101 S. Ct. 1089, 1096.

"[T]he prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause," but "the prosecutor may not rebut the defendant's prima facie case \*\*\* by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race." The State may not base a peremptory challenge on an assumption that juror bias would arise "simply because" a defendant and the venire member are both black, or on assumptions that arise "solely from the jurors' race." *Batson*, 476 U.S. at 97-98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.

"The trial court *then* will have the duty to determine if the defendant has established purposeful discrimination." (Emphasis added.) (*Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88-89, 106 S. Ct. at 1724.) "To do so, the trial court must make 'a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case.' " (*People v. Harris* (1989), 129 Ill. 2d 123, 174-75, quoting *People v. Hall* (1983), 35 Cal. 3d 161, 167, 672 P.2d 854, 858, 197 Cal. Rptr. 71, 75.) "Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those

findings great deference." *Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21; accord *Harris*, 129 Ill. 2d at 175.

Calling for a keener effort to achieve *Batson* goals of eliminating racial discrimination and preserving the benefits of peremptory challenges, one commentary has observed:

"Courts disserve both of *Batson*'s competing interests if they force prosecutors to explain any strike of a venireperson who shares the defendant's race and then accept virtually any [proffered] explanation. Yet, the prosecutor's explanation must be the focal point of judicial scrutiny if *Batson*'s protections are to have any meaning at all. Trial courts can best effectuate these protections by utilizing [a] dual inquiry ***. First, do the prosecutor's proffered motives rebut the prima facie case, creating a fact question of purposeful discrimination? Second, if so, after a review of all the evidence, including the facts raising the inference and the sum quality of the prosecutor's explanations, has the defendant ultimately proven purposeful discrimination[?]

Rebutting the prima facie case involves an independent assessment of each of the prosecutor's explanations: 1) is it specific?; 2) is it rationally related to juror bias or other characteristics affecting juror qualification[?]; and 3) is it bona fide? If each of the prosecutor's explanations passes these requirements, a fact question results. ***

A satisfactory rebuttal of the prima facie case does not end the inquiry. *** [T]here remains the ultimate determination of whether the defendant has proven intentional racial discrimination. In making this ruling, the trial court should carefully consider all relevant circumstances, including the strength of the evidence which initially raised the inference and especially the nature of the prosecutor's explanations *viewed in toto*." (Emphasis in original.) Serr & Maney, *Racism, Peremptory Challenges, and the Democratic Jury: The Jurisprudence of a Delicate Balance*, 79 J. Crim. L. & Criminology 1, 64 (1988).

It is clear from *Batson*, and the State appears to concede, that the Court envisioned a methodical, step-by-step application of its standards for judging whether purposeful jury discrimination has occurred. See also, *e.g.*, *Teague v. Lane* (1989), 489 U.S. 288, 294-95, 103 L. Ed. 2d 334, 345, 109 S. Ct. 1060, 1066 (describing *Batson* as requiring *prima facie* case, then prosecutorial explanations); *People v. Andrews* (1989), 132 Ill. 2d 451, 467 (ordering assessment of *prima facie* case, to be followed, if established, by assessment of neutral explanations); *People v. Mahaffey* (1989), 128 Ill. 2d 388, 412 (first a *prima facie* case, then articulation of race-neutral reasons).

Yet, in the present case, the trial judge collapsed the *Batson* analytical steps into an undifferentiated review of defense contentions and prosecutorial explanations. In fact, the State's brief to this court depends partly on the bootstrapping argument that the trial court's very finding of no *prima facie* case makes it unnecessary for several of the State's explanations to withstand the more searching scrutiny that would follow establishment of such a case. The trial court's finding of no *prima facie* case was made after rather than before the State had offered its explanations, and the finding was obviously based at least in part on consideration of those explanations. When asserting that in view of its explanations there was no *prima facie* case and that the explanations thus need not meet normal standards, the State's argument becomes purely circular.

If the State's after-the-fact explanations could simply be added to the balance of otherwise objective circumstances used by the trial court to decide whether a *prima facie* case has been made, then not only would a defendant's *Batson*-conferred ability to make such a case be impaired in the first place, but also it is likely that

the explanations themselves would be judged less rigorously than if they had to measure up to *Batson* standards of specificity and neutrality in order to meet a *prima facie* case already established. Such procedural inversion would distort *Batson*'s meaning.

Most courts appear to approve such a clear delineation of *Batson* analytical steps as we have just set forth. (See, *e.g.*, *United States v. Hamilton* (4th Cir. 1988), 850 F.2d 1038, 1040-41; *United States v. Cartlidge* (5th Cir. 1987), 808 F.2d 1064, 1070; *United States v. Love* (8th Cir. 1987), 815 F.2d 53, 54-55; *People v. Turner* (1986), 42 Cal. 3d 711, 719-20, 726 P.2d 102, 106-07, 230 Cal. Rptr. 656, 660-61; *State v. Gonzalez* (1988), 206 Conn. 391, 395-96, 538 A.2d 210, 212-13; *State v. Slappy* (Fla. 1988), 522 So. 2d 18; *Gamble v. State* (1987), 257 Ga. 325, 357 S.E.2d 792; *Weekly v. State* (Ind. 1986), 496 N.E.2d 29, 31; *State v. Barber* (R.I. 1988), 539 A.2d 76, 77-78; *Rodgers v. State* (Tex. App. 1987), 725 S.W.2d 477.) Our research discloses only one State in which a different view is taken. (See *State v. Kilgore* (Mo. 1989), 771 S.W.2d 57, 62 (citing *State v. Antwine* (Mo. 1987), 743 S.W.2d 51, 64, for expanding on *Batson* by requiring trial courts, as a "practical matter," to consider State's explanations prior to determining whether *prima facie* case was established).) Significantly, a procedural situation similar to the one now before us was present in *Rodgers v. State* (Tex. App. 1987), 725 S.W.2d 477, where the trial court had heard a defendant's objection to the prosecutor's use of peremptory strikes, then asked for prosecutorial explanations, then found no *prima facie* case of discrimination. Forsaking the trial court's approach, the reviewing court correctly applied the *Batson*-prescribed methodology and found that a *prima facie* case had been made on the basis of the factual circumstances (though it then concluded that the prosecutor's explanations had rebutted that case).

Two of this court's recent cases have involved a trial court's consideration of prosecutors' explanations in the course of determining whether a *prima facie* case of jury discrimination had been made. However, neither of our cases expressly approved consideration of such explanations in a context such as that here.

In *People v. Brisbon* (1989), 129 Ill. 2d 200, we merely observed that the trial court's simultaneous consideration of the State's explanations and of the defendant's proffered *prima facie* case was "what might be called a consolidated proceeding" (*Brisbon*, 129 Ill. 2d at 231). We based our affirmance of the trial court's judgment solely on our own evaluation of *objective* evidence relevant to whether a *prima facie* case had been established, not on evaluation of the State's explanations. *Brisbon*, 129 Ill. 2d at 231-32.

In *People v. Hooper* (1989), 133 Ill. 2d 469, though we affirmed a trial court judgment as to a *prima facie* case that was based on consideration of State explanations, we did so because the State's reasons for challenges were contemporaneously set forth as "statements *** during jury selection" (*Hooper*, 133 Ill. 2d at 508), which resembled one of the objective circumstances recognized by *Batson* as relevant. (See *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723 ("prosecutor's questions and statements during *voir dire* examination and in exercising his challenges").) Here, however, the State's explanations for challenging the first four black venire members came in a clump after jury selection was well along, after the panels in which those members might have been included had already been accepted and tendered by the State, and after so much time had passed that the prosecutors could not even remember one of the four who had been challenged. The State's explanation for challenging the fifth black venire member

came only after the entire jury had already been sworn and the remaining venire members had been dismissed.

In addition, *Hooper* differed from the present case in other *Batson*-significant respects. For instance, in *Hooper* the defendant, the victim, and most witnesses were black; the venire contained fewer than the usual number of black persons; the State did initially tender one black venire member; and the trial judge was more expansive in his analysis of the evidence and arguments when ruling on whether a *prima facie* case had been established.

Consequently, while *Hooper* countenanced some trial court consideration of the State's articulated reasons when deciding whether a *prima facie* case had been made, *Hooper* did so in a very different factual setting than now, and *Hooper* does not stand for a general willingness to dismantle the *Batson* analytical framework. Besides, in *People v. Andrews* (1989), 132 Ill. 2d 451, 462-63, which was decided after *Hooper*, this court noted that on remand any *prima facie* case of discrimination would be based on "all the information and evidence *defendant* is able to muster" (emphasis added) and on any notes or recollections of the trial judge. *Andrews* contained no intimation whatever of any general rule that *post hoc* State explanations may be permitted to act as a thumb on the scales while a defendant's own *prima facie* case is being weighed to see whether such explanations will even be required.

We do not mean to say that, during jury selection, a prosecutor may not give truly contemporaneous explanations of why venire members are being peremptorily challenged or that, if such explanations are given, the trial court may not treat them as a prosecutor's "statements" made while exercising challenges (*Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723) and thus as one of the circumstances to be considered in de-

termining whether a *prima facie* showing of discrimination has been made. On the other hand, neither do we mean to say that a trial court might not find the whole to be less than the sum of its parts: A series of such contemporaneous explanations, plausible as each might seem when offered, may well fail to prevent a trial court from finding that the totality of circumstances, including any racial pattern of strikes and other relevant factors, nevertheless establishes a *Batson prima facie* case once a retrospective view of the challenges is taken. In that event, the State would still have to bear the burden of articulating adequately neutral explanations (which might go beyond those contemporaneously offered while exercising challenges). The trial court would then have to weigh them searchingly in order to judge ultimately whether purposeful discrimination had occurred.

But this is not such a case. On review today, we shall adhere to the same basic *Batson* analytical scheme to which trial courts should generally adhere. Fundamental to our review is consideration of whether the present trial court erred in its eventual finding that defendant had not made a *prima facie* case of purposeful jury discrimination. For today's purposes, we shall not apply any presumption that, because explanations were requested, a *prima facie* case had been made. (But *cf. People v. Johnson* (1989), 47 Cal. 3d 1194, 1217, 767 P.2d 1047, 1054, 255 Cal. Rptr. 569, 576 (stating presumption); *State v. Gonzalez* (1988), 206 Conn. 391, 397, 538 A.2d 210, 213 (same); *State v. Walton* (1988), 227 Neb. 559, 562, 418 N.W.2d 589, 591 (same).) Rather, we shall analyze the question substantively. Then, if the trial court's articulated finding of no *prima facie* case is not sustained, we can turn to the question of the State's proffered explanations for its peremptory challenges.

Ordinarily, addressing that second question might require remand to the trial court for another *Batson* hear-

.ing in order to arrive at a new, procedurally correct finding on the ultimate issue of purposeful discrimination, followed by the deferential treatment that we should normally accord such a finding. See *Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21 (deference ordinarily required); *People v. Andrews* (1989), 132 Ill. 2d 451, 461 (initial assessment of *prima facie* case is province of trial court).

However, in the present cause, the parties have already twice marshaled their evidence and arguments in the trial court. One effort was pre-*Batson* but contemporaneous with trial; the other was post-*Batson* but not in procedural conformity with *Batson*. Together, they produced a record that equals or exceeds in detail what might well be available for our usual review.

Moreover, though sketchily and in unorthodox fashion, the trial court has articulated a specific and reviewable finding on the threshold question of defendant's *prima facie* case, as well as a finding on the ultimate issue of purposeful discrimination. This is true even though, despite our directions on remand, the record fails to show any explicit findings of fact or conclusions of law by the trial court, beyond the bare conclusions that no *prima facie* case was made and that no purposeful discrimination occurred. *Cf. People v. Harris* (1989), 129 Ill. 2d 123, 187 (findings of fact are desired in order to facilitate meaningful appellate review).

Thus, record deficiencies notwithstanding, we feel that we now have all the factual submissions that are likely or necessary in order for us to judge, without further remand, not only whether the trial court erred in ruling that defendant had failed to make a *prima facie* case, but also whether a procedurally proper but otherwise identical ultimate finding of no purposeful discrimination would have been contrary to the manifest weight of the evidence so as to support reversal (*People v.*

*Harris* (1989), 129 Ill. 2d 123, 175; *People v. Mahaffey* (1989), 128 Ill. 2d 388, 413). See *People v. Holman* (1989), 132 Ill. 2d 128, 173-75; *cf. United States Postal Service Board of Governors v. Aikens* (1983), 460 U.S. 711, 715, 75 L. Ed. 2d 403, 410, 103 S. Ct. 1478, 1482 ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case *** [t]he district court has before it all the evidence it needs to decide whether 'the defendant intentionally discriminated against the plaintiff.' [Citation.]"); *United States v. Forbes* (5th Cir. 1987), 816 F.2d 1006, 1010 (where trial court found no *Batson* *prima facie* case but required prosecutorial explanation, reviewing court would assume *prima facie* case and review ultimate finding as to purposeful discrimination).

If we judge that a procedurally regular finding of no purposeful discrimination would have been contrary to the manifest weight of the evidence, then *a fortiori* the finding irregularly made by the trial court in the present cause will warrant reversal. However, if we judge otherwise, then the trial court's finding in the present cause, though irregularly made, will stand.

## B. PRIMA FACIE CASE

The sole remaining question regarding the present defendant's *prima facie* case is whether these facts "and any other relevant circumstances raise[d] an inference" of purposeful discrimination. *Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723.

One relevant circumstance is whether there was a pattern of State strikes against black venire members. The fact that the State peremptorily challenged all black venire members who were reached for *voir dire* and who were not excused for cause certainly suffices to establish a mere "pattern" of such strikes. A pattern of strikes is not the same as a finished garment of adjudicated dis-

.crimination. To create a pattern, strikes should do more than occasionally involve venire members of a certain race. The strikes should affect those members to such a degree or with such a lack of apparent nonracial explanation as to suggest the possibility of racial motivation; but they need only suggest, because if the strikes and other relevant circumstances establish a *prima facie* case, merely the burden of production is then shifted to the State. The presumption created by the *prima facie* case, including any pattern that helped to establish it, may yet be blunted with alacrity if the State offers a *Batson*-sufficient neutral explanation. Then—after the trial court weighs the evidence in light of the *prima facie* case, the adequately articulated neutral explanations, and any rebuttal of those explanations—the court will decide the ultimate question whether purposeful discrimination has been shown by a preponderance of the evidence. See *People v. Harris* (1989), 129 Ill. 2d 123, 177.

In the present case, there was more than a mere pattern: A markedly disproportionate use of strikes against black venire members was established. This is true despite the State's assertion that, because more than half of its peremptory challenges were exercised against persons who were not black, race-neutral rather than disproportionate use of strikes is shown. Some 13 or 14 of approximately 75 venire members were black; this was 19% of the venire. Black persons constituted an even smaller percentage (12%) of those venire members reached for *voir dire* and not excused for cause. Yet, nearly 50% of the State's peremptory challenges exercised (5 out of 11) were against this black 12% of the venire, resulting in a jury that was 100% devoid of black persons. We are conscious that, in determining whether a *prima facie* case has been made, a court "should consider more than simply the number of jurors excluded."

(*People v. Young* (1989), 128 Ill. 2d 1, 19; accord *People v. Hooper* (1989), 133 Ill. 2d at 505; *People v. Hooper* (1987), 118 Ill. 2d 244, 247-48 (Ryan, J., specially concurring, joined by Ward & Moran, JJ.).) However, this disproportion was unquestionably very relevant to establishing defendant's case, because, justifiably or not, it represented a gross racial imbalance in jury selection. See *People v. Holman* (1989), 132 Ill. 2d 128, 176-77 (percentages cited by State were important in assessing defense attempt to establish *prima facie* case); *cf. Gamble v. State* (1987), 257 Ga. 325, 326, 357 S.E.2d 792, 794 (23.8% of venire black; 0% of jury black; all prosecution strikes used to exclude all black venire members; *prima facie* case established).

As defendant points out, the differing races of defendant and the murder victim constitute another circumstance relevant to establishing a *prima facie* case under *Batson*. (*Cf. Holman*, 132 Ill. 2d at 177 (racial issues minimized where defendant and all victims were black).) The State argues that the victims of the armed violence of which defendant was convicted, as well as many witnesses, were black, but it remains true that the victim of the most serious crime—murder—was white and was in addition a police officer attempting to arrest defendant. The victim of the attempted murder was a wounded police officer assisting in the arrest and was also white.

These racial facts were recognized as important by the trial judge himself. The trial judge asked each venire member whether his or her objectivity would be impaired by the differing races of defendant and the white victims of the most serious crimes. The trial judge also singled out the disparity between defendant's race and the race of the white victims when he expressed doubt to defense counsel as to whether a prosecution peremptory challenge based on that fact might not actually be

valid. And, in his opening remarks to the venire, the trial judge emphasized the white victims' importance to the case when he mentioned repeatedly that victims included a murdered police officer and his partner. Against these facts, the State cannot seriously contend that the circumstances of the crimes involved no racial elements that might be relevant to the *Batson* hearing and our review.

The heterogeneity of the peremptorily excluded black venire members is also a circumstance highly relevant for *Batson* purposes. Demographically, these venire members were as diverse as the community at large, except for race. They were also as diverse, though racially as nondiverse, as the jurors whom the State accepted.

Both the peremptorily challenged black venire members and the accepted jurors included persons who were jobless or employed at various levels; married, single, or divorced; regular or nonpracticing religious communicants; young or middle-aged; male or female; parents or childless; of longer or shorter residential tenure; victims of crime or not. Some of the jurors and some of the rejected black venire members were, or had immediate family members who were, of the same approximate age as defendant; for that matter, many persons do. Arguably, even in the face of a trial judge's contrary finding in a given case, such general demographic similarity (except for race) between accepted and rejected venire members would be sufficient on review to discredit a prosecutor's explanations as pretextual after a *prima facie* case had once been made. (*Cf. People v. Holman* (1989), 132 Ill. 2d 128, 176 (substantial dissimilarity of whites and blacks impeded establishment of *prima facie* case). But *cf. People v. Young* (1989), 128 Ill. 2d 1, 23 (substantial similarity was not sufficient to reverse trial court's finding that State rebutted *prima facie* case; similarities may sometimes be accompanied by salient

and unique dissimilarities).) But, whether or not such similarity might suffice as a ground for actually reversing a trial court's factual finding that a *prima facie* case was refuted by State explanations, it certainly sufficed here to form part of the *prima facie* case in the first place. See *People v. Harris* (1989), 129 Ill. 2d 123, 180 (similarities reflected in *prima facie* case entitled to great weight in evaluating State's explanations); *People v. McDonald* (1988), 125 Ill. 2d 182, 199-200 (similarities reflected in *prima facie* case made State explanation inadequate).

We judge, after carefully examining the record, that defendant made a *prima facie* case of purposeful discrimination under *Batson* and that the trial court's contrary finding was against the manifest weight of the properly considered evidence. Our opinion is fortified by observing that the court failed to maintain a clear separation between the process of assessing a *prima facie* case and the process of weighing the State's proffered explanations. Rather, the court plainly considered the State's explanations, meager as they sometimes were, when initially determining whether a *prima facie* case had been made. *Cf. People v. Mahaffey* (1989), 128 Ill. 2d 388, 407-09, 414 (*prima facie* case and explanations intermingled, but, rather than relying on explanations, trial court based *prima facie* determination on its own systematic review of stricken black venire members' characteristics to assess independently their heterogeneity and their comparability to stricken white venire members).

## C. NEGATING THE PRIMA FACIE CASE

Having determined that defendant made a *prima facie* case under *Batson*, we now turn to a review of the trial court's implicit finding that the State's explanations negated any inference of purposeful discrimination.

In so doing, we are conscious that the State's explanations must first be clear, reasonably specific, legitimate, and nonracial in order to dispel the presumption created by the *prima facie* case (*Batson*, 476 U.S. at 98 n.20, 90 L. Ed. 2d at 88 n.20, 106 S. Ct. at 1724 n.20); that the trial court's effort at evaluating those explanations must then be sincere and reasoned in order to support a finding on the ultimate discrimination issue (*People v. Harris* (1989), 129 Ill. 2d 123, 174-75); and that ordinarily we should give great deference to the trial court's findings of fact on purposeful discrimination (*Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21; *Harris*, 129 Ill. 2d at 175).

Defendant contends that the State should be held to its original contemporaneous attempts at explanation rather than being allowed to supplement its original record with additional, post-*Batson* rationales. For analytical purposes, we shall attach no importance to the mere fact that some of the State's explanations came years after others were offered. We disregard this temporal disparity for several reasons. The prosecution was laboring under a lesser, pre-*Batson* burden at the 1982 hearing and thus had less incentive to develop a full record of its reasons for exercising peremptory strikes. The prosecution was called upon to do so without the benefit of a transcript or preparation time. And, since assessment of the prosecution's reasons largely resolves to a question of credibility, which the trial court is in the best position to judge, we defer to that court's decision to believe the prosecution's statement of reasons unless we find that the trial court's finding of no purposeful discrimination was against the manifest weight of the evidence.

*Gay.* The prosecutors originally could not remember venire member Gayle Gay or why they had challenged her earlier in the day, but the trial judge offered that he would have done so because she was "a young black lady

about the same age as the defendant." Five years later, one of the prosecutors said that Gay's having been the victim of an unsolved felony was "the first thing that came to our mind" and that her challenge was primarily because of that fact. The prosecutor added that Gay had initially appeared to say that the unsolved crime might affect her impartiality, and that, despite her quick self-correction, the State had still been concerned. The prosecutor also argued that the State had peremptorily challenged five nonblack venire members for similar crime-related reasons.

Although defendant urges that the strikes of the black venire members should properly be compared to nonblack members who were accepted, rather than to nonblack members who were rejected, we believe that in appropriate circumstances either mode of comparison could properly be employed by a trial court in reaching its ultimate finding on purposeful discrimination. Compare *People v. Harris* (1989), 129 Ill. 2d 123, 180 (comparison of rejected with accepted should be given "great weight"), and *People v. Young* (1989), 128 Ill. 2d 1, 23-24 (discussing comparison of rejected with accepted), with *People v. Mahaffey* (1989), 128 Ill. 2d 388 (comparing rejected blacks with rejected whites), and *Ex parte Branch* (Ala. 1987), 526 So. 2d 609, 621-25, 626 n.13 (rejected-accepted and rejected-rejected comparisons may be proper under *Batson*). See also *People v. Hall* (1983), 35 Cal. 3d 161, 168-69, 672 P.2d 854, 858-59, 197 Cal. Rptr. 71, 75-76 (comparing rejected with accepted); *Hall*, 35 Cal. 3d at 171-73, 672 P.2d at 860-61, 197 Cal. Rptr. at 77-79 (Bird, C.J., concurring) (recognizing that rejected-rejected comparisons may be proper if State actually shows that comparison groups were similarly situated and were rejected on identical or comparable grounds); *People v. Johnson* (1989), 47 Cal. 3d 1194, 1220-21, 767 P.2d 1047, 1056-57, 255 Cal. Rptr. 569, 578-79 (disap-

proving a reviewing court's "undue emphasis" on its own cold-record rejected-accepted comparison, limiting the detail required in trial courts' rejected-accepted comparisons, and allowing trial courts to make both rejected-accepted and rejected-rejected comparisons). But see *Tompkins v. State* (Tex. Crim. App. 1987), 774 S.W.2d 195, 202 & n.6A, *aff'd by an equally divided Court* (1989), 490 U.S. 754, 104 L. Ed. 2d 834, 109 S. Ct. 2180 (O'Connor, J., not participating) (rejected-accepted comparison would have been highly relevant); *State v. Slappy* (Fla. 1988), 522 So. 2d 18, 22, *aff'g Slappy v. State* (Fla. App. 1987), 503 So. 2d 350 (rejected-accepted comparison); *Gamble v. State* (1987), 257 Ga. 325, 328-30, 357 S.E.2d 792, 795-96 (same); *State v. Butler* (Mo. App. 1987), 731 S.W.2d 265, 271-72 (same); *State v. Gilmore* (1986), 103 N.J. 508, 511 A.2d 1150 (preferring rejected-accepted over rejected-rejected comparison).

In the present case, the trial court chose to credit the State's comparison of rejected black venire members with nonblack members who the State said were rejected for similar reasons. Defendant sought to distinguish these nonblack venire members from the five black members whose challenges he attacks as discriminatory. The State claimed that it challenged all these nonblack and black venire members because they had all had experiences with crime. Of course, defendant could not directly show that the State's cited reason for challenging the nonblack members was not the State's true reason, and as the judge of credibility the trial court accepted the State's explanation.

It is undeniable that Gay was of about defendant's age and that her answer to a question on impartiality could sincerely, even if mistakenly, be construed as equivocal. Defendant contends that it would be more probative to compare the excluded black venire members with allegedly similar nonblacks who were accepted by the

State. However, we cannot say that the manifest weight of the evidence dictated a decision contrary to the trial court's implicit conclusion that the State had articulated a credible, legitimate, specific, nonracial explanation for challenging Gay and that defendant had failed to prove purposeful discrimination by the preponderance of evidence.

The trial judge's own 1982 reference to Gay as being "black" and a "lady," no matter how inappropriate or how suggestive of improper considerations, cannot actually be presumed to have played a part in the court's 1987 assessment of the prosecutors' credibility in explaining why they challenged her. Even though the trial judge had volunteered that Gay's race, sex, and proximity in age to defendant's age were reasons that he might have challenged her, he had at least arguably been attempting merely to refresh the prosecutors' recollection of Gay. In any event, regardless of how we might decide a matter if we sat as a court of first instance, we cannot on review substitute our judgment for the trial court's when we cannot find the judgment of the latter to be against the manifest weight of the evidence.

*Franklin.* The State explained its challenge of Kenneth Franklin by derogating his brief employment history; by saying that he could hardly talk to, look at, or understand the court; and by stating that he was a young, unemployed, single man of about defendant's age and without community roots. These explanations were facially legitimate, specific, and race-neutral, and again we cannot say that the trial court decided against the manifest weight of the evidence in finding such State explanations credible and preponderant.

Defendant argues that two jurors or alternates were also unemployed, but a large number of factors can enter into decisions to exercise peremptory challenges that are not susceptible of point-for-point comparison with de-

cisions not to exercise them. "If a prosecutor excused one person and not another it does not follow that this in itself shows that the prosecutor's explanations were pretextual." (*People v. Young* (1989), 128 Ill. 2d 1, 23.) An unemployed venire member's 20 years of residence with an unemployed mother do not automatically equate with "community roots"; even though unemployment is not necessarily rootlessness, employment may rationally be viewed as the chief or only substantial form of "community roots" in some individual situations. Moreover, the trial judge was present and saw Franklin's demeanor prior to deciding the credibility of the State's explanation citing that demeanor.

*Buckley.* Despite the State's apparent confusion over whether Buckley or his brother was a drug counselor, either fact would clearly be a legitimate, specific, race-neutral reason for challenging him. Once again, it was the trial judge's role to pass on the credibility of the State's explanation that the occupation of drug counseling was its reason for challenging Buckley. Defendant does not and cannot say with confidence that the drug-counseling connection was immaterial to the State's decision to challenge Buckley. Neither can we.

*Bartlett.* Some of our comments about the demeanor-based challenge of Franklin might apply equally to the challenge of Bartlett. In addition, she gave an equivocal answer regarding membership in a group that at one point she called "Defenders." The trial court had discretion to decide that the State credibly cited these facts in explaining why it challenged her and that the State's explanations preponderated over any *prima facie* case on defendant's part.

*Wadley.* With or without a factual basis, the State represented that it had reason to believe that a certain witness could be found near or in the building where Wadley lived. When this representation was first made,

defense counsel voiced no contemporaneous disagreement with it. If credible (as the court found it to be), this was a legitimate, specific, and race-neutral explanation, especially when coupled with the additional fact that Wadley's age was similar to defendant's.

In sum, regarding these five black venire members, the trial court's finding of no purposeful discrimination cannot be said with confidence to be against the manifest weight of the evidence.

We recognize that the *Batson*-related procedural irregularities in this cause, and a certain paucity of analysis in the trial court's treatment of the *Batson* issue, are related to the fact that these proceedings spanned the pre- and post-*Batson* eras at a time when *Batson* requirements were less clear than today. Thus, as post-*Batson* jurisprudential and prosecutorial standards evolve to maturity, it may not be vain to hope that the procedural flaws of this cause and of its contemporaries will become purely anomalous.

## D. OTHER BATSON HEARING ISSUES

### 1. Denial of Substitution Motion

Defendant contends that, at the 1987 *Batson* hearing, the trial judge openly held a strong and fixed predisposition, manifested at the 1982 proceedings, that legitimate reasons underlay the disputed challenges of black venire members. Accordingly, defendant contends that his 1987 motion for substitution of judge was erroneously denied and that the ensuing hearing did not comport with due process of law. (*People ex rel. Przyblinski v. Scott* (1959), 23 Ill. App. 2d 167, 170, *aff'd* (1960), 19 Ill. 2d 500; *United States v. Sciuto* (7th Cir. 1976), 531 F.2d 842, 845.) As examples of cases in which judicial predisposition was held to have warranted substitution of judges, defendant cites *People v. Chatman* (1967), 36 Ill.

2d 305, and *People v. Robinson* (1974), 18 Ill. App. 3d 804. As evidence of the trial judge's alleged predisposition, defendant also points to the judge's inquiry of defense counsel at the *Batson* hearing as to whether a challenge could be based on the differing races of defendant and victim and to the judge's response that he was "not too sure" that counsel's negative reply was correct.

However, when defendant made his motion for substitution of judge, he failed to adduce any of the reasons he now sets forth. (Granted, when defendant made his motion, he could not yet have referred to the trial judge's later comments regarding differing races of defendants and victims, but neither did defendant make any attempt to renew the motion thereafter.) The entire exchange between counsel and judge pertaining to the motion was as follows:

> "MR. [ISAACSON, assistant public defender]: We're going to file this motion with the clerk. It's an SOJ. I'll tender a copy to the State.
>
> MR. ARTHUR [assistant State's Attorney]: Acknowledge receipt, Judge.
>
> THE COURT: I don't know under what section you are filing this.
>
> MR. [ISAACSON]: The reason we don't say the section is that there is no law on it. As Your Honor knows what this really is is an SOJ for cause. Obviously it's a matter of right because it's not here for trial.
>
> THE COURT: It's going to be denied. What else?"

Section 114—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 114—5) requires that a motion for substitution of judge be in writing (*People v. Agnew* (1983), 97 Ill. 2d 354, 358) and that, if more than a statutorily limited time has elapsed after a cause has been placed on a judge's trial call, the motion be supported by affidavit showing cause for the substitution (see *People v. Marshall* (1988), 165 Ill. App. 3d 968,

974-75). Defendant has not pointed out where, if at all, his motion is to be found in the record on appeal, and we have not discovered it.

Assuming that the written motion was supported by any requisite affidavit and that the trial judge's statement that the motion was "going to be denied" amounted to denial, it is true, as defendant contends, that the trial judge "summarily denied" the motion: Defense counsel was not invited to proceed except for answering the judge's query regarding the statutory section under which the motion was brought. In turn, this at least calls into question whether the statutory mandate to "conduct a hearing and determine the merits of the motion" was complied with. (See Ill. Rev. Stat. 1985, ch. 38, par. 114—5(c); *cf. People v. Myles* (1980), 83 Ill. App. 3d 843, 852-53, *rev'd on other grounds* (1981), 86 Ill. 2d 260 (oral argument was sufficient without evidentiary hearing when judge knew defendant's reasons for motion and had conducted proceeding that prompted it); *People v. Spurlark* (1978), 67 Ill. App. 3d 186, 201 (explicitly extending opportunity for oral argument constituted sufficient hearing); *People v. Pinchott* (1977), 55 Ill. App. 3d 601, 602-03 (oral argument opportunity constituted hearing).) We note parenthetically that, at the time of the *Batson* hearing, the hearing on a motion for substitution of judge did not have to be before a different judge if the motion was made under section 114—5(c) after more than a limited time had elapsed since a cause was placed on a judge's trial call. Since the time of the *Batson* hearing, an amendment to the section has become effective, requiring that a judge not named in the motion conduct the hearing. See Ill. Rev. Stat. 1987, ch. 38, par. 114—5(c).

Nevertheless, precisely because the written motion is absent from the record, and because the report of proceedings fails to show that defendant made any attempt

to present to the trial judge the grounds on which defendant now relies in support of his motion, defendant through procedural default has waived such grounds for appeal purposes. (See *People v. Curtiss* (1984), 126 Ill. App. 3d 568, 572-73; *People v. Bach* (1979), 74 Ill. App. 3d 893, 896.) Moreover, lack of specificity in a motion for substitution of judge has been held to be a valid reason for denying it even when no hearing is held on the motion. *People v. Marshall* (1988), 165 Ill. App. 3d 968, 975.

Nor would our plain error doctrine (see 107 Ill. 2d R. 615(a)) apply even if defendant sought to invoke it (which he has not done). That doctrine permits us to take notice of plain errors and defects affecting substantial rights in instances where the evidence is closely balanced or where the error affected the fundamental fairness of the proceeding. (*People v. Fields* (1990), 135 Ill. 2d 18, 56.) Here, the evidence of defendant's guilt is overwhelming. If it is evidence pertinent to the substitution motion itself on which we are to focus, such evidence would have concerned whether cause existed for allowing the motion. We have already observed that defendant has failed to show that any such evidence at all was presented by affidavit or, even informally, in open court when his motion was made. Thus, there is no question of a close balance, regardless of which body of evidence is to be considered. Neither can we say that the fundamental fairness of the proceedings was impaired by denying the substitution motion.

Finally, we note the strong presumption that judges rely only on proper evidence in reaching determinations on the merits. The fact that a judge has ruled adversely to a defendant on a previous occasion does not necessarily disqualify the judge from later sitting in judgment of the same defendant's claims. See *People v. Vance* (1979), 76 Ill. 2d 171, 178; *People v. Berland* (1978), 74 Ill. 2d

286, 310; *People v. Beasley* (1982), 108 Ill. App. 3d 301, 309; *People v. Massarella* (1979), 80 Ill. App. 3d 552, 565.

Thus, the fact that the trial judge had rejected defendant's claim of discrimination in jury selection on the basis of 1982 law does not by itself imply that the judge would hold a strong predisposition and would not fairly decide defendant's renewed claim on the basis of 1987 law. The trial judge did consider defendant's claims and rejected them, stating that he had heard nothing in 1987 that would alter the conclusion he had enunciated in 1982. This had the same effect as setting forth in full again his 1982 conclusions.

However, the State does stray when it argues that we did not direct the trial judge to "make his reasoning of record." As we have already observed, our remand order did specifically direct the circuit court to make "appropriate findings of fact and conclusions of law" and to file them with our court's clerk. The fact that the circuit court failed to comply diligently with this order, though regrettable, does not undermine our conclusion that the trial judge's 1987 reaffirmance of his 1982 findings represented substantial compliance with his *Batson* obligations.

## 2. "Supplementation of Record" and Impartiality

In a contention closely related to the preceding one, defendant argues that in 1987 the trial judge did not evaluate the legitimacy of the State's explanations for striking black venire members but heard them only to "supplement the record." Defendant also argues that the presumption of the judge's fairness and impartiality is rebutted by the judge's 1982 characterization of some black venire members as "bums," by his 1982 reference to Gay's race in explaining why he as a prosecutor might have wished to challenge her, and by his 1987 statement

of uncertainty about whether *Batson* precludes a race-based challenge of a black venire member when the crime victim is white and the defendant black. Finally, defendant argues that the trial judge held race alone to be a proper basis for peremptory challenges and that this supposed holding failed to reflect an informed exercise of discretion or an application of the correct legal standard.

We find no fault with the trial judge simply for characterizing the State's 1987 explanations as a supplementation of the record. In complying with our remand order and deciding defendant's claim of impermissible discrimination in jury selection, the judge was entitled to consider the 1982 record as well as the record of the 1987 hearing. Indeed, defendant himself tendered the 1982 transcript of proceedings (along with jury cards) to the judge as his entire 1987 evidentiary submission on the *Batson* issue. In that light, the State's explanations at the 1987 hearing can be said to have supplemented the 1982 record. Such a characterization does not imply that the judge was unwilling to evaluate the State's explanations anew.

We are more concerned with those remarks by the judge that, according to defendant, rebut the presumption of impartiality.

The "bums" comment alone, though coarse, provides little support for defendant's contention. At that point in the proceedings, only black venire members were at issue. Thus, the comment necessarily referred to certain unspecified black persons. We find nothing inherently race-specific in a reference to "bums," nor any reason to believe that, if a group of white venire members had been at issue and had included individuals of a socioeconomic status or background similar to that of any black members to whom the judge was referring, the judge would not similarly have labeled them.

The judge's 1982 reference to Gay's race and his 1987 expression of uncertainty about the scope of *Batson* are troubling, however.

It is true that *Batson* forbids acceptance of prosecutorial explanations for challenges to black venire members if the explanations rely on assumptions that arise "solely" from the venire members' race, or on assumptions that the venire members would be biased in favor of a black defendant "simply" because of their common race. (*Batson*, 476 U.S. at 97-98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) Here, not only were defendant and the challenged venire members black, but also principal victims were white; and not only were Gay and defendant black, but also they were of similar ages. In other words, the defendant's and challenged venire members' common race *in combination with* certain other facts arguably supported the challenges at issue. Thus, through a naked parsing of *Batson,* it might be contended that such "race-plus" peremptory challenges are generally permissible, and were permissible in the present cause. Though to its credit the State makes no such *Batson*-based argument in support of the trial court's actual 1987 ruling on defendant's motion for a new trial, the State implicitly advances a similar theory to support validating the trial judge's 1982 comment on Gay's race. The State points out that *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, had not yet been modified by *Batson* and that *Swain* had relieved prosecutors of any duty to explain their reasons for particular peremptory challenges. The State therefore suggests that *Swain* may, at the time when the judge's 1982 comment was uttered, have legitimized the judge's "race-plus" reference to Gay's combined race, sex, and age.

The State's suggestion is without merit. First, even if prosecutors did not have to explain peremptory challenges, it would not logically follow that admittedly race-

based challenges were permissible or that a trial judge's implicit endorsement thereof was proper. Second, *Swain* specifically disapproved challenges that were overtly race-based (see *Swain*, 380 U.S. at 203-04, 13 L. Ed. 2d at 763-64, 85 S. Ct. at 826-27), despite tolerating, for the sake of honoring the peremptory-challenge system, challenges that had an unspoken racial basis (see *Swain*, 380 U.S. at 220-21, 13 L. Ed. 2d at 772-73, 85 S. Ct. at 836). (See also *Batson*, 476 U.S. at 101 n.*, 90 L. Ed. 2d at 90 n.*, 106 S. Ct. at 1725 n.* (White, J., concurring) (*Swain* would allow invalidation of challenge if prosecutorially volunteered explanation is race-based); *Garrett v. Morris* (8th Cir. 1987), 815 F.2d 509, 511-13 (same); *Weathersby v. Morris* (9th Cir. 1983), 708 F.2d 1493, 1496 (same); *cf. Teague v. Lane* (1989), 489 U.S. 288, 297, 103 L. Ed. 2d 334, 347, 109 S. Ct. 1060, 1067-68 (declining, because of perceived Illinois procedural default and failure to show cause therefor and prejudice therefrom, to address merits of claim that *Swain* allowed examination of prosecutorially volunteered explanations for challenges); *Teague*, 489 U.S. at 323-26, 103 L. Ed. 2d at 364-66, 109 S. Ct. at 1082-83 (Stevens, J., concurring in part and in the judgment) (expressing view that Illinois courts might consider petitioner's *Swain* claim as within fundamental-fairness exception to waiver rule on collateral review). But see *Teague v. Lane* (7th Cir. 1987), 820 F.2d 832, 834 n.6 (*en banc*), *aff'd on other grounds* (1989), 489 U.S. 288, 103 L. Ed. 2d 334, 109 S. Ct. 1060 (stating that *Swain* barred equal protection challenge to strikes in a lone case even if they were shown to be based on race); *United States v. Danzey* (E.D.N.Y. 1979), 476 F. Supp. 1065, *aff'd without written opinion* (2d Cir. 1980), 620 F.2d 286 (stating that *Swain* barred review even of volunteered explanations).) Third, even assuming that *Swain* might have tolerated an explicitly race-based challenge (or a trial judge's ap-

proval of one), it is the trial judge's 1987 ruling, not any understanding of the law that he may have had in 1982, that is before us. Accordingly, whether he was legally right in 1982 does not settle the matter if his 1982 view had become incorrect under 1987 law *and* if we can say that in his 1987 ruling he relied on that wrong view of the law.

At least by 1987, any view that consideration of a venire member's race could justify a prosecutor's peremptory challenge had become wrong. Some language in *Batson* does refer to peremptory challenges based "simply" or "solely" on race. (But see *Batson*, 476 U.S. at 96-97, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723 (referring more broadly to exclusion "on account of" race).) However, we reject any notion that *Batson* offers solace to prosecutors who explain challenges on "race-plus" grounds. Our chief reason is simple: The "race-plus" concept is largely illusory in the context of a *Batson* hearing.

If black venire members' disparate treatment as compared to that of similarly situated white persons is alleged, then it is insufficient or even self-defeating for a prosecutor to explain that a black venire member's race plus another factor motivated the challenge. Such an explanation will not, of itself, justify the allegedly disparate treatment, since the reference to race will leave unanswered how it was proper to challenge the black but not a comparable white venire member. On the other hand, if a prosecutor adequately explains the challenge of a black venire member by distinguishing on nonracial grounds an allegedly comparable and unchallenged white venire member—or even if the prosecutor resorts to relying on the nonspecific possibility that "in some other respect" the white juror was desirable, and then secures a favorable trial-court ruling to which we generally show great deference (see *People v. Young* (1989), 128 Ill. 2d

1, 23-24)—the prosecutor's explanation will not have depended on the illusory "race-plus" concept after all.

Furthermore, if a prosecutor's explanation is really so limited as to make citation of the challenged venire member's race essential to the explanation's coherence, then the explanation can truly be said to rest "solely" or "simply" on the racial factor—for otherwise, stripped of the racial underpinning, it would effectively not have been a sufficient explanation at all and would have failed to rebut a *Batson prima facie* case.

Either way, therefore, *Batson* cannot be viewed as permitting the trial judge or the State to explain Gay's challenge by actually relying on her race, even as one of several factors. This conclusion is buttressed by characterizations of *Batson* in later cases. (See *Holland v. Illinois* (1990), 493 U.S. 474, 486, 107 L. Ed. 2d 905, 920, 110 S. Ct. 803, 811 (systematic exclusion "of blacks" from jury system is obviously unlawful); *Holland*, 493 U.S. at 488, 107 L. Ed. 2d at 921, 110 S. Ct. at 811 (Kennedy, J., concurring) (excluding juror "on the basis of" race is constitutional violation); *People v. Harris* (1989), 129 Ill. 2d 123, 174 (assumption of sympathy "because of" shared race is impermissible); *cf. Wilkerson v. Texas* (1989), 493 U.S. 924, 926-28, 107 L. Ed. 2d 272, 273-75, 110 S. Ct. 292, 293-95 (Marshall, J., joined by Brennan, J., dissenting from denial of *cert.*) ("race-plus" explanations do not satisfy *Batson* requirement of "neutral" explanations).) Given the fact that other young, female, but white venire members went unchallenged by the State, the State does not persuade by now arguing that the trial judge's reference to Gay as a "black" lady might have been merely incidental to his consideration of her sex and age as components of some sexual attraction toward defendant. Accordingly, it would be improper for us to approve such a judicially volunteered 1982 explanation if, as the State seemingly would permit, we imputed

it to the prosecutors as a basis for their 1987 explanations at the *Batson* hearing.

But the prosecutors' own 1987 explanations, based on Gay's crime-victim experience and her arguably equivocal answers at *voir dire*, provided adequate independent grounds for the trial judge to find in 1987 that the challenge to Gay was based on nonracial factors. And we cannot say that the judge's expressed 1982 concern about Gay's and defendant's race, or his 1987 uncertainty about the role of race in justifying peremptory challenges, though legally erroneous, rebutted the presumption of his impartiality. A judge can be wrong without being partial.

For these reasons, and given the deference we show to trial courts' *Batson* findings, defendant has not shown that he was prejudiced by any race-based surplusage in the trial judge's volunteered 1982 explanation of Gay's challenge, however improper it was. Nor has defendant shown that the trial judge lacked impartiality or that he failed in 1987 to assess defendant's *Batson* claim. Defendant is also incorrect in arguing that the trial judge "held" that *Batson* allowed race alone to be the basis of peremptory challenges. Though the trial judge demonstrated an incomplete understanding of evolving and complex *Batson* law in not sufficiently recognizing racial motivations as discriminatory, his expression of uncertainty did not constitute the holding that defendant alleges. And the trial judge's discretion in finding no racial discrimination against Gay was sufficiently informed, because articulated reasons of crime victimization and equivocation adequately supported his finding.

### 3. Nondisclosure of Jury Notes

Defendant contends that the prosecutors' jury selection notes contained notations or omissions inconsistent with their explanations for challenging black venire

members and that the trial court erred in finding the notes irrelevant and in withholding them from disclosure to defendant.

Besides arguing erroneously that defendant failed to make a *prima facie* case under *Batson* and thus had no right to any explanations for the State's challenges, the State responds that at a *Batson* hearing a defendant has no right to cross-examine a prosecutor about proffered explanations and that defendant therefore had no right to use the notes for cross-examination. The State also responds that the trial judge, as trier of fact, did view the notes and found that nothing in them would help defendant, so that defendant suffered no prejudice. In addition, the State responds that nothing in the notes shows inconsistency in explanations, or even shows the race of venire members (with the possible exception of one venire member who was excused for cause).

Defendant replies that the trial judge's comments strongly indicated that he sympathized with the State and that defense counsel's assessment of the notes and resulting advocacy certainly would have differed from the trial judge's views.

Much of defendant's argument depends on the assumption that such notes will necessarily reflect every factor that the State later cites in support of its decision to challenge and that, if a cited factor is recorded for a white person who goes unchallenged but is unrecorded for a black person who is challenged, this discrepancy will undercut the State's explanation. Yet such notes are made subjectively under the pressure of time and events during *voir dire*; they are not systematic, nor are they required to be. If, as the State points out, a venire member is challenged because of an answer given only moments before, the notetaker may fail to record the answer in the notes. Yet, that fact alone should not impugn the good faith of a proffered explanation or cast doubt

on whether, at the time a venire member was challenged, the prosecutor could have recalled the answer that is later cited as an explanation for the challenge.

Defendant also errs when he analyzes the issue of note disclosure in terms of such criminal evidentiary concepts as discovery of prior written statements of intended State witnesses (107 Ill. 2d Rules 412(a)(i), (a)(ii), (a)(iii)) and proof of a defendant's guilty knowledge and absence of mistake.

The prosecutors here were not defendants. Neither were they State witnesses in the sense of Rule 412, which applies to criminal trials on the merits, not to preliminary hearings. (See 107 Ill. 2d R. 411.) Just as Rule 412 does not apply to preliminary hearings, it should not be applied mandatorily to post-conviction *Batson* hearings.

Furthermore, as we decided while this appeal was pending, prosecutors are not subject to cross-examination on oath at *Batson* hearings. (*People v. Harris* (1989), 129 Ill. 2d 123, 174; *People v. Young* (1989), 128 Ill. 2d 1, 24-26.) We have expressly declined to adopt such a requirement. *People v. Mack* (1989), 128 Ill. 2d 231, 251-52 (citing cases); *Young*, 128 Ill. 2d at 24-26. But see Note, *Defense Presence and Participation: A Procedural Minimum for Batson v. Kentucky Hearings*, 99 Yale L.J. 187, 205-06 (1989) (note by Brett M. Kavanaugh) (arguing that during typical *Batson* hearings trial courts should have discretion whether to permit full evidentiary format with sworn cross-examination of prosecutor but that *Batson* hearings held on remand should, because of time lapse and complexity of issues, be required to follow such format; citing cases).

Defendant has cited no controlling authority for his contention that the trial judge erred in examining the jury selection notes *in camera* but refusing to disclose them to defendant. We believe that the question whether

to disclose the notes was within the trial judge's discretion and that the procedure he employed and the entry of his resultant findings were not abuses of that discretion. And, for reasons to which we have already referred, we cannot see in the notes' contents or omissions any substantial support for defendant's contentions of prosecutorial discrimination in jury selection or bad faith in explaining challenges.

## E. CLAIMS OF TRIAL ERROR

We turn now to defendant's other contentions regarding his trial and conviction.

In his brief, defendant raises two related objections to the qualification of the jury under *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770. During *voir dire* the trial judge excused for cause three venire members who said that their opposition to capital punishment would prevent them from ever determining that it should be imposed as a sentence. Defendant argues that the removal of those persons violated his sixth amendment right to a jury drawn from a fair cross-section of the community and his fourteenth amendment right to an impartial jury. However, after submission of defendant's brief, identical challenges to the "death qualification" of juries were rejected in *Lockhart v. McCree* (1986), 476 U.S. 162, 90 L. Ed. 2d 137, 106 S. Ct. 1758, and we reject them here. Accord *People v. Brisbon* (1989), 129 Ill. 2d 200, 225-27; *People v. Flores* (1989), 128 Ill. 2d 66, 92.

Defendant also argues that the trial court erred in refusing to ask venire members whether they would automatically vote to impose the death penalty if they found defendant guilty of murdering a police officer. Defendant submits that "life qualifying" the venire members in such manner would have enabled him to identify prospective jurors who would refuse to follow

the law as well as allowing him to use his peremptory challenges more intelligently. This court has held that the trial judge need not pose such a question *sua sponte* (*People v. Caballero* (1984), 102 Ill. 2d 23, 45), even though a defendant "is free" to question venire members regarding bias in order to uncover any who would vote to impose the death penalty in every case of murder, thereby establishing cause for excusing the venire member from service (*People v. Brisbon* (1985), 106 Ill. 2d 342, 360). In the present cause, however, the trial judge conducted the *voir dire* himself and refused defense counsel's request to make the inquiry for which defendant now argues. We have never specifically addressed the propriety of a judge's refusal to make such an inquiry.

A trial court has discretion as to the manner and scope of *voir dire*, but "it may constitute reversible error if the court fails to permit pertinent questions that would enable a party to determine whether the jurors are free from bias or prejudice which would constitute a basis for challenge for cause, or which would enable a party to intelligently exercise his or her right of peremptory challenge." (*People v. Porter* (1986), 111 Ill. 2d 386, 401; accord *People v. Lobb* (1959), 17 Ill. 2d 287, 300; *People v. DeLordo* (1932), 350 Ill. 148, 155.) While it seems that the trial judge should have probed for bias against the statutorily mandated capital sentencing process upon being requested to do so, we do not believe that the failure to do so here was reversible error. The judge did ask venire members whether their ability to give defendant a fair trial could be affected by any of several circumstances, including (1) the racial differences between defendant and the police officers and (2) the murder victim's status as a police officer. The *voir dire* was complete in all other respects, and the jury was cor-

rectly instructed on the proper method for making the sentencing determination.

Defendant also argues that the trial judge's questioning of one venire member regarding his racial attitudes was incomplete. Defendant submits that more extensive questioning was necessary to enable defense counsel to consider intelligently a challenge to that person. After that prospective juror was examined, the trial court denied counsel's requests to excuse him for cause or to ask him additional questions. Counsel then peremptorily challenged that venire member.

However, defendant may not complain now of the examination of that venire member, for the defense failed to exhaust its allotment of peremptory challenges. (*People v. Ford* (1960), 19 Ill. 2d 466, 475; see *People v. Collins* (1985), 106 Ill. 2d 237, 271-72.) Counsel exercised only 15 of 20 peremptory challenges, including the one to the venire member in question. If defendant is arguing that further questioning might have led instead to defense counsel's decision to accept the venire member as a juror, we would note that a defendant is entitled to be tried by an impartial jury, not to the presence of a particular person on the jury. *People v. Lobb* (1959), 17 Ill. 2d 287, 301.

Defendant next argues that the trial judge erred in refusing to declare a mistrial for the State's failure to disclose, in discovery, a statement made by defendant to a police officer. Officer Darlene Witherspoon testified that on February 5, 1982, while on routine patrol, she responded to an emergency call and arrived at the scene of the shooting. Officer Mantia was there, and defendant was lying face down in the snow, with his arms handcuffed behind his back. Mantia told Witherspoon to watch defendant while Mantia returned to the bus. Witherspoon denied in her testimony that defendant acted in an intoxicated or drugged manner, and she de-

scribed him as being "very smug" when he was put into a police car. On cross-examination, defense counsel attempted to show that Witherspoon's opinion was not based on anything that defendant had said, but Witherspoon answered a question indicating that although she had not spoken to defendant, he had said something to her. On redirect examination, Witherspoon explained that she had characterized defendant's attitude as smug on the basis of what he had said; she did not reveal what the statement was. Outside the jury's presence, defense counsel moved for a mistrial because the statement had not been disclosed during discovery. One of the prosecutors explained that defendant had said something to the effect of having "shot a cop." The trial judge denied the motion for a mistrial.

The State does not dispute that the statement made by defendant in Witherspoon's presence should have been disclosed in response to his motion for discovery. (See 87 Ill. 2d R. 412(a)(ii).) No prejudice resulted from that omission, however, and the motion for a mistrial was properly denied. In *People v. Weaver* (1982), 92 Ill. 2d 545, 560-61, in considering when a failure to disclose a defendant's statements, which were used by the State at trial, would be reversible error, the court said:

"The closer the evidence, the stronger is the case for excluding the statement or declaring a mistrial. The strength of the undisclosed evidence, the likelihood that prior notice could have helped the defense discredit the evidence, the feasibility of continuance rather than a more drastic sanction, and the wilfulness of the State in failing to disclose are also factors which must be considered. While an indication of specific harm is helpful to a defendant in establishing that a discovery violation was prejudicial, its absence is not decisive in itself."

Here the statement itself was not revealed to the jury; its sole use pertained to the basis for Officer Wither-

spoon's assessment of defendant's attitude as smug. Independently of that, she testified that defendant was not intoxicated or drugged.

Most significantly, the evidence of defendant's guilt was overwhelming. As the State observes, defendant committed the offenses on a crowded bus and was captured immediately afterward. No question could be raised of defendant's identity, and none is. The defense of intoxication was raised, but evidence establishing that defendant acted with the requisite mental state was strong. Testimony of the State's witnesses regarding defendant's behavior established his requisite mental state. As related by the witnesses on the bus, defendant was able to behave in a purposeful manner.

Moreover, evidence presented by defendant belied his own defense. Defendant testified that he had gone out to pick up some drugs and money after receiving a telephone call, and he described in detail the route and conveyances he took from a friend's house to the point of the murder. He testified that he knew where he was going and how to get there. In fact, defendant did not even unequivocally deny that he knew what he was doing when he shot Officer Doyle; he testified that he did "not necessarily" act knowingly. Defendant's own expert witness, Dr. Senay, effectively negated the defense when he gave his opinion, based on defendant's description of the drugs and alcohol he had consumed on the day in question, that although defendant was moderately to severely intoxicated and his judgment was mildly impaired, he knew what he was doing and acted intentionally. The rule is well established that "[v]oluntary alcohol or drug intoxication is no defense to criminal conduct unless the intoxication is so extreme as to make impossible the existence of a mental state which is an element of the crime. (Ill. Rev. Stat. 1981, ch. 38, par. 6—3; *People v. Walcher* (1969), 42 Ill. 2d 159, 163.)" (*People v. Madej*

(1985), 106 Ill. 2d 201, 216.) For these reasons, then, the discovery violation was harmless.

Defendant next alleges several instances of misconduct by the prosecution during the trial and urges that the cumulative, if not individual, effect of these alleged errors denied him a fair trial.

Defendant argues that the State improperly suggested during cross-examination of defendant's expert witness, Dr. Senay, that, two months after being examined by Dr. Senay, defendant gave jail personnel an inconsistent account of his history of drug and alcohol use. No evidence of the supposed contrary account was ever introduced, but defendant's motion to strike that part of the cross-examination was denied. Defendant also argues that his cross-examination by the State was improper. Defendant was asked whether a certain weapon was the one that had "murdered" Officer Doyle; later, defendant was asked whether he agreed with Dr. Senay's opinion that he knew what he was doing and intended to do it. Though the last question formally seems to seek defendant's mere opinion of an expert's testimony, in substance it can be interpreted as asking defendant about an essential element of his own intoxication defense, and as such it appears to this court to be within the bounds of proper cross-examination. (Cf. People v. Kline (1980), 90 Ill. App. 3d 1008, 1014 (defendant witness' opinion as to his state of mind was essential part of self-defense claim and proper subject of examination).) As for the other alleged errors, the prosecution should have avoided unsupported and argumentative cross-examination, but the witnesses' own answers mitigated its effect. Dr. Senay answered that he would not believe a lesser history. Defendant simply gave noncommittal answers. Given the overwhelming evidence, these errors were harmless.

Defendant also complains of several remarks by the prosecution that were directed at his intoxication de-

fense. In closing argument, the prosecutor said that, out of the "molehill" of drugs found on defendant when he was arrested, "the Defense has created a mountain." He continued by stating that one of the witnesses who testified to defendant's intoxication was a relative of defendant's and that the relative, after being summoned to testify in support of an intoxication defense that would require a showing of extreme intoxication if it were to succeed, "had the idea." The prosecutor also argued that the defense's expert witness was "hand-picked." No objection to any of these comments was made at trial or in the post-trial motion.

"[S]tatements made in closing arguments by the prosecution which suggest that defense counsel fabricated a defense theory, attempted to free his client through trickery or deception, or suborned perjury are improper." (*People v. Emerson* (1983), 97 Ill. 2d 487, 497.) However, this is not a case like *Emerson* or *People v. Freedman* (1954), 4 Ill. 2d 414. In *Emerson*, the prosecution told the jury that all defense attorneys try to "dirty up the victim" and that defense counsel had had to "make something up" and had laid down a smokescreen consisting partly of "lies"; in *Freedman*, the prosecutor suggested that the defendant's story had come out only "after talking with that clever lawyer." Here, the "molehill" comment, in context, did not accuse defense counsel of fabrication or trickery but simply argued the implausibility of the defense theory. The reference to the defense witness' having "had the idea," though close to the line, was extremely vague and did not suggest that defense counsel had suborned perjury, but only that defendant's relative had a motive to lie. We find nothing improper in the reference to Dr. Senay's being handpicked.

Defendant contends that both the guilt phase of his trial and his sentencing hearing were irreparably prejudiced by improper appeals to the emotions of the jurors.

Defendant correctly notes that the prosecution repeatedly argued and introduced evidence on the actual or supposed reaction of Officer Doyle's family to the victim's death and defendant's trial. Commenting on the weakness of the intoxication defense here, the prosecutor said that Doyle's family and the Chicago police department would be horrified to learn that a person could use drugs, commit offenses of the type shown here, and then be found not guilty. Later, the prosecutor mentioned defendant's eventual recognition that he had committed the offenses and said that defendant's audacity in apologizing for the crimes would "rip the heart out of" Doyle's sister and mother. Finally, in rebuttal argument, the prosecutor said that the murder of Doyle "robbed a sister of a brother" and "robbed a family of a son." Defense counsel's objections to all three of these comments were overruled.

Such prosecutorial argument has repeatedly been condemned and was unprofessional. (See *People v. Caballero* (1989), 126 Ill. 2d 248, 272.) The reaction and feelings of a victim's family were plainly irrelevant to the question of guilt and to the validity of the defense theory. Similar attempts to inflame the jury by showing a murder's effect on the victim's survivors required us to reverse this defendant's other conviction for murder. (*People v. Hope* (1986), 116 Ill. 2d 265 (*Hope I*).) Here, though, the evidence was so overwhelming that it is clear beyond doubt that defendant would have been convicted even without the improper arguments.

Defendant also contends that the trial judge erred in refusing to instruct the jury at trial on the mental states of intent and knowledge. Defendant tendered instructions setting forth the statutory definitions of the terms. (See Ill. Rev. Stat. 1981, ch. 38, pars. 4–4, 4–5.) Defendant argues that instructions defining those terms were necessary because his defense was an attempt to

demonstrate that he could not have acted with those mental states.

When defendant was tried, there were no pattern jury instructions defining "knowingly" and "intentionally," though it was said to be appropriate in certain cases to define those terms. (See Illinois Pattern Jury Instructions, Criminal, No. 5.02A, Committee Note (2d ed. 1981) (hereinafter IPI Criminal 2d).) Since defendant's trial, pattern instructions defining intent and knowledge have been prepared. (See IPI Criminal 2d Nos. 5.01A, 5.01B (Supp. 1989).) These pattern instructions were occasioned by a case (*People v. Brouder* (1988), 168 Ill. App. 3d 938) in which a conviction was reversed for failure to define "knowingly" after the jury had twice requested a definition and had reported confusion. However, the committee responsible for the new pattern instructions has noted that it takes no position on whether they should be given in the absence of a specific jury request (see IPI Criminal 2d Nos. 5.01A, 5.01B, Committee Notes (Supp. 1989)), and no such request was made in the present cause. The committee has also noted, as do we, the general proposition that "intentionally" and "knowingly" have a plain meaning within a jury's common understanding. See IPI Criminal 2d Nos. 5.01A, 5.01B, Committee Notes (Supp. 1989), citing *People v. Powell* (1987), 159 Ill. App. 3d 1005.

We do not believe that special instructions were necessary here. The jury was appropriately instructed on the nature of defendant's intoxication and drug defense and how the defense could negate his criminal responsibility. The jury was also instructed on the State's burden of proving, beyond a reasonable doubt, that defendant had been capable of acting knowingly or intentionally. The terms have commonly understood meanings, and, because other, adequate instructions were given, definitions would not have aided the jury in its task. (See

*Powell*, 159 Ill. App. 3d at 1013; *People v. Montgomery* (1974), 18 Ill. App. 3d 828, 834; see also *People v. Reid* (1990), 136 Ill. 2d 27, 39 (jurors entitled to have questions answered, but in some circumstances trial court has discretion to refrain from answering).) Refusal to define the terms was not error here.

In sum, the trial errors that occurred, whether considered singly or cumulatively, do not warrant reversing defendant's convictions.

## F. CLAIMS OF SENTENCING ERROR

Defendant's sentencing hearing was conducted before the same jury that had determined his guilt. The statutory circumstance on which the State relied to show defendant's eligibility for the death penalty was that "the murdered individual was a peace officer *** killed in the course of performing his official duties and the defendant knew or should have known that the murdered individual was a peace officer." (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(1).) Over defendant's objection, the hearing was conducted in a single stage at which both eligibility for the penalty and all the evidence in aggravation and mitigation were considered in succession.

In order to prove defendant's eligibility for the death penalty, the State first established Doyle's status as a police officer through testimony of the Chicago police department's personnel director, who read to the jury Doyle's oath. The State then presented several witnesses in aggravation, who testified to other crimes committed by defendant. This evidence showed that, several weeks before the offenses involved here, defendant had participated in another murder and attempted murder (convictions later reversed by us in *Hope I*) and that he had been convicted of robbery in 1977 and of armed robbery in 1978.

A surviving witness to the *Hope I* crimes, a security guard, related how defendant had created a disturbance in a restaurant, so that he and a second guard were induced to approach defendant, whereupon defendant's accomplice had entered the premises and killed the second guard with a sawed-off shotgun. The witness described how defendant had then knocked him to the floor, stood over him while holding a sawed-off rifle to his head, and slowly squeezed the trigger while smiling. The witness testified that he had evaded the rifle shot but pretended to be dead and that defendant then had robbed him of his gun. Evidence at the trial of the present cause showed this weapon to have been one of the two guns in defendant's possession during the subsequent crimes that are involved here. Witnesses also testified to a burglary and another robbery allegedly committed by defendant, as well as to a charge of unlawful use of weapons by defendant. Other witnesses related defendant's gang affiliation and his misconduct in prison and in the Cook County jail.

In mitigation, defendant presented the testimony of family members—including his parents—and friends, who spoke of their affection for him and who recounted his difficult and impoverished childhood. Defendant also presented the favorable testimony of a nun who had met him in the Cook County jail during his incarceration pending trial on the charges here.

The State then called one rebuttal witness, Detective Patricia Hickey, whose testimony we shall discuss further. In addition, the parties stipulated that the jury could consider all of the evidence that had been introduced at trial and that defendant was over 18 years of age at the time he committed the offenses here.

We have already found that, because of overwhelming evidence of defendant's guilt, it was not reversible error to permit the State's improper argument regarding the

murder victim's survivors at the guilt phase of defendant's trial, since beyond doubt the jury's verdict of guilt would have been the same without such argument. Far different, however, is the matter of whether the jury's sentencing verdict would have been the same without the additional, protracted, and similarly improper evidence and argument regarding survivors that it heard during the sentencing phase. This question leaves us with abiding doubt.

The climactic rebuttal testimony of Detective Hickey, who was the last witness heard by the jury at the sentencing hearing, covers eight pages of the record. It focused solely on the reaction of Officer Doyle's mother to her son's death and on the effect that the crime had on her. This testimony dwelt on the mother's profound grief, her closeness to and dependence on her son, his devotion to her, the material and spiritual deprivation she would suffer because of his murder, and Officer Doyle's sister's statement to Hickey that the mother could not attend the trial because to do so would "tear her heart out."

The prosecution's initial and rebuttal closing arguments at the sentencing hearing urged the jury to consider the impact of Officer Doyle's death on his mother. The prosecution also urged the jury to consider the impact on the security guard's widow and children created by the previous murder for which accountability was attributed to defendant by the testimony of the guard's surviving partner.

We believe that the net effect of the prosecution's tactics in dwelling on survivors at both the guilt and sentencing phases of trial was to create an emotionally charged atmosphere in which it was impossible for defendant to receive a sentencing hearing untainted by passion and prejudice.

Such evidence and argument offend the teaching of *Booth v. Maryland* (1987), 482 U.S. 496, 502-06, 96 L. Ed. 2d 440, 448-50, 107 S. Ct. 2529, 2532-35, that such evidence is irrelevant to the unique setting of capital sentencing—which must have an individualized focus on the defendant rather than on the fortuity of the victim's or survivors' identity, circumstances, or articulateness—and that the admission of such evidence "creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner."

The decision in *Booth*, of course, was announced after the trial of this cause, but it clearly applies retroactively here, since this direct appeal was pending when *Booth* was decided. (See *Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708; *People v. Simms* (1988), 121 Ill. 2d 259, 271-72.) Exposing the jury to the evidence and argument regarding survivors also contravened existing Illinois law. *E.g., People v. Bernette* (1964), 30 Ill. 2d 359; *People v. Gregory* (1961), 22 Ill. 2d 601; *People v. Dukes* (1957), 12 Ill. 2d 334; *Filippo v. People* (1906), 224 Ill. 212.

Nor can the prosecutorial improprieties here be distinguished. These were not the type of incidental references found tolerable under *Booth* and Illinois precedent in *People v. Del Vecchio* (1989), 129 Ill. 2d 265, 287-91. Here, the objectionable testimony and argument did "dwell upon [the] family as victims" and were "presented in a manner likely to appeal to the jury's sensitivities." (*Del Vecchio*, 129 Ill. 2d at 291.) They were not limited sections of a written presentence report, as in *People v. Phillips* (1989), 127 Ill. 2d 499, 536-37, and *People v. Jones* (1988), 123 Ill. 2d 387, 424-25. The prosecution's argument about survivors was not "general and vague" as in *People v. Spreitzer* (1988), 123 Ill. 2d 1, 37. The evidence and argument were not necessary to the proper presentation of the State's case, merely an incidental re-

flection of the obvious fact that the victim left a family, or isolated references of minor significance, as discussed in *People v. Barrow* (1989), 133 Ill. 2d 226, 272, 274-75.

On the contrary, here we have as powerfully emotion-laden a body of argument and testimony as supported the finding of reversible error in *People v. Simms* (1988), 121 Ill. 2d 259—and in *Simms* the argument and testimony were heard by a sentencing judge alone rather than, as here, by a presumably more impressionable jury. As for the State's suggestion that any error was harmless here, "[t]he extent to which such inflammatory [evidence and argument] affected the jury *** in its vote to impose the death penalty will never be known" (*Hope I*, 116 Ill. 2d at 278), and "[w]e cannot speculate as to the extent to which the jury was influenced by this incompetent evidence and inflammatory argument" (*People v. Dukes* (1957), 12 Ill. 2d 334, 340).

The State exacerbated the error here by also dwelling on the horror and outrage of Officer Doyle's colleagues in the police department. Officer Doyle's status as a police officer was a relevant factor in aggravation, but the attitude of other officers was not. *Cf. People v. Ramirez* (1983), 98 Ill. 2d 439 (vacating a death sentence in part because of improper argument as to the deceased's status as a police officer).

The State cannot successfully contend that defendant invited the improper survivor references by presenting testimony as to defendant's and his mother's remorse over the murder's effects on Mrs. Doyle. This testimony followed rather than preceded the State's initiation of argument regarding survivors, which had occurred at the guilt phase of trial. In addition, the testimony appeared to be spontaneous and not the result of leading questions, and it recognized Mrs. Doyle's suffering rather than disputing it.

Neither can the State prevail by contending that defendant's mitigation evidence of his own family's suffering opened the door to the survivor evidence in aggravation. Besides the fact that ample precedent forbids such survivor evidence as irrelevant and prejudicial, a defendant's right to offer any relevant evidence in mitigation is unalloyed, does not depend on any symmetry with the State's ability to present aggravation evidence, and derives from its own constitutional sources. See *McKoy v. North Carolina* (1990), 494 U.S. 433, 439-43, 108 L. Ed. 2d 369, 378-81, 110 S. Ct. 1227, 1231-32; *Blystone v. Pennsylvania* (1990), 494 U.S. 299, 304-05, 108 L. Ed. 2d 255, 263, 110 S. Ct. 1078, 1082; *Penry v. Lynaugh* (1989), 492 U.S. 302, 318-28, 106 L. Ed. 2d 256, 277-84, 109 S. Ct. 2934, 2946-52; *Eddings v. Oklahoma* (1982), 455 U.S. 104, 110-12, 71 L. Ed. 2d 1, 8-9, 102 S. Ct. 869, 874-75; *Lockett v. Ohio* (1978), 438 U.S. 586, 604-05, 57 L. Ed. 2d 973, 990, 98 S. Ct. 2954, 2964-65 (plurality opinion); *People v. Ruiz* (1989), 132 Ill. 2d 1, 25.

We understand and sympathize with the grief of Officer Doyle's family. We also understand and sympathize with the outrage of Officer Doyle's colleagues over his tragic and senseless murder; and we recognize the ever-present dangers that confront police officers in the line of duty. However, we must uphold the law and assure that the death penalty, when imposed, is the product of deliberate and rational consideration rather than emotion.

Accordingly, defendant's convictions are affirmed, his sentence of death is vacated, and the cause is remanded to the circuit court of Cook County for further proceedings consistent with this opinion.

*Convictions affirmed;*
*sentence vacated;*
*cause remanded.*